## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**WENDY WAGNER,** *et al,*

                    **Plaintiffs,**

          *vs.*                                **No. 11-cv-1841(JEB)**

**FEDERAL ELECTION COMMISSION,**

                    **Defendant.**

## PLAINTIFFS' STATEMENT OF POINTS AND AUTHORITIES
## IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

This case challenges the constitutionality of the portion of 2 U.S.C. § 441c ("section 441c") that makes it unlawful for an individual who has a contract with a federal agency to make a contribution – in any amount – to a candidate for federal office, to a political party, or to a political committee for use in connection with any federal election. The defendant Federal Election Commission ("FEC") is the federal agency responsible for the enforcement of the Federal Election Campaign Act, 2 U.S.C. §§ 431 *et seq* ("FECA"), which includes section 441c. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Each of the plaintiffs is currently a paid consultant to a federal agency, and each of them is also an individual eligible to vote in the 2012 federal elections. Plaintiffs believe that there are no material facts at issue in this case, and they have submitted with this motion a Statement of Undisputed Material Facts, with references to the short declarations that they have submitted that support those facts. For that reason those references will not be repeated herein. The FEC believes that discovery is necessary, but rather than litigate that question, the parties have agreed upon a schedule for discovery

and briefing on the merits and for plaintiffs to make this motion for a preliminary injunction.

Preliminary relief is essential for plaintiffs because this is a presidential election year in which plaintiffs wish to support the candidates and parties of their choosing, which they cannot do under the schedule that the FEC claimed it needs for discovery and briefing on the merits. Plaintiffs set forth below the standards for granting a preliminary injunction and for assessing the constitutionality of section 441c, and they demonstrate that they can satisfy those requirements. At this time, they wish to emphasize two points: (1) the relief sought will apply only to these three plaintiffs and not to any of the many other individuals with government contracts who are also subject to section 441c; and (2) any contributions that they make will be limited in the same manner and amounts as those of any other individual who is not subject to this or some other ban.

The challenge set forth in plaintiffs' amended complaint dated January 31, 2012 has two separate claims, either of which is sufficient to set aside the ban on contributions by individuals who perform services under contracts with federal agencies. The first is an equal protection claim based on the fact that there are several sets of persons who are similarly situated to plaintiffs, to whom the absolute ban in section 441c does not apply. These include two distinct groups: (I) individual officers and employees of almost all federal agencies, including the very agencies for which plaintiffs work; and (II) (a) political committees of contracting corporations that can be established and administered by such corporations; (b) officers, directors, employees, and stockholders of contracting corporations; and (c) individuals who have incorporated their personal services businesses and have their corporation as the contracting entity. As explained more fully

below, plaintiffs contend that the ban is subject to strict scrutiny under the Equal

Protection Clause, but it cannot be justified no matter what level of scrutiny is applied.

That is because section 441c imposes an absolute ban on plaintiffs' First Amendment

protected activity of making a political contribution to a candidate for an elected federal

office or to a political committee or political party for use in connection with a federal

election, while placing no such restrictions on others who are similarly situated. That is

indefensible under any standard of review.

Plaintiffs' second claim is a First Amendment challenge to the absolute ban on

contributions in section 441c.  The Supreme Court has never upheld a total ban on

contributions by a category of individuals who are eligible to vote in federal elections,

and this Court should not do so either.  The only arguable justification for this ban is that

the making of a political contribution can be perceived, in some situations, as an

improper inducement to award or to steer a contract to the person making the

contribution.  That theoretical justification cannot apply here because the only persons to

whom a federal contribution can be made are either candidates for federal office who

have no role in the awarding of the contracts of plaintiffs (and almost all other individual

who have federal personal services contracts) or entities such a political parties or

political committees that have no authority whatsoever to award any federal contract.

The total mismatch between the absolute ban on contributions by individual contractors

and any potential for influencing the persons who award their contracts dooms this law,

no matter what level of scrutiny is applied.

## THE STATUTORY SCHEME

FECA is a complex statute that regulates the use of money in elections for federal office.  Unlike states and localities that have many elected positions, including many that have significant roles in governmental contracting, the only elected federal offices are President, Vice President, Members of the House of Representative, United States Senators, and (non-voting) Delegates and Resident Commissioners.  FECA has numerous provisions relating to the making of contributions and expenditures, but for the purposes of this lawsuit, there are only a few of relevance.

First,  2 U.S.C. §441a (a)(1) places limits on the amount of money that an individual may contribute to candidates, political parties, and political committees, as well as imposing overall total limits on what that individual may contribute to all such persons in a given election cycle.  Some of those limits are indexed for inflation, and for the 2011-12 election cycle, they are $2500 (candidates, per election); $30,800 (political parties, per calendar year); $5000 (political committees, per calendar year); and $117,000 (total per 2 year election cycle). http://www.fec.gov/pages/brochures/contriblimits.shtml. If plaintiffs prevail in this lawsuit, they would still be subject to all those limitations, as well as any others in FECA.

Second, under section 441b, all corporations are forbidden from making contributions to candidates for federal office, as well as to political parties and political committees that support such candidates.  However, subsection 441b(b)(2)(C) specifically allows corporations to expend money to be used for "the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes," from which the fund may make contributions that the

corporation itself would be prohibited from making.   Contributions to such a fund, which is a type of political committee, can be solicited only from the corporation's "stockholders and their families and its executive or administrative personnel and their families." Subsection 441b(b)(4)(A)(i).  That exception also modifies the otherwise absolute ban on contributions by labor unions.  However, because unions do not ordinarily have contracts with federal agencies, they will not be referred to further herein.

Third, there is section 441c, which is being challenged in this action as it applies to individuals, but not to corporations. Congress enacted the predecessor of section 441c in 1940, and it was codified in 1972 (with minor modifications) as 2 U.S.C. § 611 of FECA.  It was amended in 1976 by the addition of subsections (b) and (c), and the three subsections were designated section 441c by section 322 of Public Law 94-283 (1976). The full text of subsection 441c(a) is set forth in the note below.[1]  As it relates to this case, the essence of section 441c is that it makes it

---

[1] (a) It shall be unlawful for any person--

(1) who enters into any contract with the United States or any department or agency thereof either for the rendition of personal services or furnishing any material, supplies, or equipment to the United States or any department or agency thereof or for selling any land or building to the United States or any department or agency thereof, if payment for the performance of such contract or payment for such material, supplies, equipment, land, or building is to be made in whole or in part from funds appropriated by the Congress, at any time between the commencement of negotiations for and the later of (A) the completion of performance under; or (B) the termination of negotiations for, such contract or furnishing of material, supplies, equipment, land, or buildings, directly or indirectly to make any contribution of money or other things of value, or to promise expressly or impliedly to make any such contribution to any political party, committee, or candidate for public office or to any person for any political purpose or use; or

(2) knowingly to solicit any such contribution from any such person for any such purpose during any such period.

> unlawful for any person . . . who enters into any contract with the United States or any department or agency thereof . . . for the rendition of personal services . . . if payment . . . is to be made . . . from funds appropriated by the Congress, at any time between the commencement of negotiations . . . and . . . the completion of performance, . . . to make any contribution . . . to any political party, committee, or candidate for public office or to any person for any political purpose or use.

Or, in plain English, in addition to the laws forbidding bribery, it is a crime for a person – either an individual or a corporation – that has a contract with the federal government to make a contribution in connection with a federal election while negotiating for, or performing under, that contract.  Violation of section 441c is a felony and, depending on the amount of the unlawful contribution, can result in the imposition of a sentence of up to five years in prison, or a fine under Title 18, or both.  2 U.S.C. § 437g(d)(1)(A).  Read literally, these prohibitions apply to state, local, and federal elections, but the FEC has construed section 441c to apply only to federal elections.  11 C.F.R. § 115.2(a).

Several other aspects of the seemingly absolute ban in section 441c are of significance.  Subsection (b), enacted in 1976, re-enacts the separate segregated fund exception in section 441b(b)(2), to make it clear that it creates an exception to the ban in section 441c, as well as that in section 441b.  Thus, for example, even though large government contractors like The Boeing Company or IBM are barred from attempting to obtain a government contract by making contributions for use in federal elections, Boeing PAC or IBM PAC can make such contributions from a separate fund if the corporation has one.  In order that there is no uncertainty about the connection between such separate funds and the entity that sponsors them, Congress has provided in 2 U.S.C. § 432(e)(5) that "[t]he name of any separate segregated fund established pursuant to section 441b(b) of this title shall include the name of its connected organization," *i.e. ,*Boeing or IBM.

In addition to the exclusion of separate segregated funds from the ban on corporate contributions by government contractors, the FEC has, properly in our view, construed section 441c in 11 C.F.R. § 115.6, not to apply to stockholders, directors, officers, or employees of a federal contractor. There is no limitation on the kind of corporation to which this exclusion applies. Thus, the President of Boeing would not be subject to the ban of section 441c, nor would someone who is the sole owner, officer, and employee of a limited liability company (LLC) that enters a personal services contract with a federal agency.

Finally, there is no ban under current law generally applicable to individuals who work for the federal government as either officers or employees. There is one general limitation not found in Title 2, but in 18 U.S.C. § 603, which is part of the Hatch Act, but its narrow scope underscores the contrast with the ban in section 441c. Section 603 forbids contributions where "the person receiving such contribution is the employer or employing authority of the person making the contribution." That quite limited prohibition appears designed mainly to guard against overreaching by the person soliciting the contribution – by forbidding such contributions entirely, rather than by trying to define what kinds of requests go too far. It still leaves federal workers free to make contributions to any candidate by whom they are not currently employed, which mainly precludes contributions to a sitting member of Congress by his or her immediate staff, or to the campaign of the President by someone who works directly for the President. But it does not limit in any way a federal employee's ability to make a contribution to a political party or a political committee, such as Emily's List or any of the various Right to Life Committees that have been so active in federal elections and in

challenging various campaign finance laws.  As the declarations of plaintiffs spell out, these federal officers and employees often work side by side with plaintiffs and other individuals who perform under personal services contracts with federal agencies, with much of the work being performed interchangeably between contractors and full time employees.  *Infra,* at 10-14.  In addition, there are a few rules (at 20-21) that impose additional restrictions on employees of designated sensitive agencies, such as the FEC, the FBI, and the CIA, but none of them come close to applying to the kind of work that plaintiffs perform.

There is another aspect of federal contract law that bears on the First Amendment claim in this case.  Pursuant to 48 C.F.R. §1.601(a), the heads of all federal agencies are vested with contracting authority, which they may, and generally do, delegate to others. What is important for this challenge is that the heads of federal agencies are not elected, like the President and Members of Congress, but are appointed by the President, with the advice and consent of the Senate, as "Heads of Departments" pursuant to Article II, section 2, clause 2.  Not only does the law state who shall award contracts and assure their proper performance, the plaintiffs' declarations show that appointed agency officials, not elected officers, actually made the relevant contract determinations for them.  Moreover, the declaration of Steven L. Schooner attests that it is unelected agency officials, not the President, Vice President or Members of Congress who ordinarily make the decisions regarding contracts that individuals have with federal agencies.[2]

---

[2] Congress has the power to direct the President and/or agency heads to enter into specific contracts, by enacting a law to that effect.  In that situation, a law directed at forbidding the influencing of legislative decisions on government contracts by making a contribution to obtain a contract would present a different case, but section 441c is not such a law. Moreover, although Congress may from time to time legislate in a manner (continued)

Finally, section 441c applies only to contracts with the federal government, but not to other similar financial transactions through which the Government makes substantial payments to individuals, who might believe that making a political contribution would enhance their chances of obtaining such a payment.  Thus, section 441c excludes grants, as well as other financial transactions, not to mention other benefits that the Government conveys on others.  For that reason, it is under-inclusive, as well as over-inclusive, both of which seriously undermine any claim that section 441c is designed to curb the appearance of corruption through "pay-to-play" schemes involving political contributions.

## THE PLAINTIFFS

The three plaintiffs currently serve as consultants to federal agencies under contracts that make them subject to the ban in section 441c.  Each of them is eligible to vote in the 2012 federal elections.  Each of the plaintiffs has, prior to becoming a consultant, and hence becoming subject to section 441c, made contributions to candidates for election to federal offices and/or to political parties and political committees, in some cases in their own names and in some cases jointly with their spouses. Each of the plaintiffs would like to make such contributions now, but section 441c prohibits them from doing so and would subject them to criminal prosecution if they made a contribution to a candidate for federal office or to a political committee or political party that supports candidates for federal office.

---

(continued) that may affect the award of major defense or aerospace contracts to large corporations, we are unaware of any such legislation involving individual personal services contracts, let alone any situation in which an individual allegedly made a political contribution in order to obtain such a contract.

**Plaintiff Wagner** is a professor of law at the University of Texas Law School. Her principal area of scholarship is the law-science interface in environmental law. She is currently performing under a contract under which she is being paid $12,000 by the Administrative Conference of the United States ("ACUS"), an agency of the United States.  Under her contract, which was approved by ACUS officials, none of whom is elected, she is obligated to prepare a report and recommendations on potential improvements in the use of science by administrative agencies in rulemaking, adjudication, and/or other agency functions.  As shown by the affidavit of Jeffrey S. Lubbers, former research director for ACUS and now a consultant to it, ACUS regularly hires academics, primarily law professors, to prepare studies in connection with the preparation of draft recommendations that ACUS will debate and vote on.  As is the case for most ACUS consultants, and was true for plaintiff Wagner, the staff identifies potential consultants, based on their areas of expertise and the scope of the proposed project, and approaches the individual to determine his or her interest and availability. Consultant fees at ACUS generally range from $5,000 to $12,000 per project.  For ACUS, the choice of consultants, and the amount to be paid to them, is determined by the Chairman and the staff, none of whom is an elected federal officer.

A consultant's work is reviewed by ACUS staff and then discussed by the relevant committee of ACUS members before going to the ACUS Council, which is in effect its governing board, and then to the membership for a vote.  In many cases, the original recommendation will undergo substantial changes before it is presented to the full ACUS membership, which then discusses and often further amends the recommendation.  In some cases, ACUS uses its own staff to do the same type of work

being done by plaintiff Wagner and other outside consultants.  The choice between staff

and outside consultants is affected by considerations such as budget, availability of staff

to undertake the project, the timing of the project, and the expertise available from the

staff.

Wagner has recently moved her domicile from Ohio to Texas and is now

registered to vote there.  She wishes to be able to make political contributions in

connection with the 2012 federal elections, but the ban in section 441c precludes her

from doing so.

**Plaintiff Brown** was for many years a full-time employee of USAID and its

predecessor agency in the United States and abroad.  After he retired in February 2003,

he worked for about three and a half years in the private sector until he became a paid

advisor under contract with USAID in Washington as a Senior Human Resources

Advisor.  In that capacity he supervised three civil service employees and one contract

employee and worked with civil service employees and other advisors under contracts

similar to his, under the overall supervision of agency officials.  In this work, there was

no functional distinction in terms of the work performed between employees on the one

hand and contractor-advisors on the other.

Brown's current contract became effective on October 1, 2011, and under it he is

doing essentially the same types of work as he did previously.  Like all of his contracts

with USAID, he negotiated it with agency officials, none of whom is an elected official

of the United States.  He is paid at the rate of $598.08 per day ($74.76 an hour), and the

term of his contract is two years, renewable at the option of USAID for three additional

years.  He earns sick leave and vacation pay as do regular employees.  Federal taxes are

withheld from his paycheck, and the agency pays the employer's share of Social Security and Medicare taxes applicable to him.

Before Brown became a contractor, he was unaware of the ban in section 441c. Because of the ban, he has made no contributions in connection with federal elections although he previously did so.  Because everyone with whom he works at USAID treats him no differently than those who are regular employees, he considers it only fair that he be allowed to make contributions as he had done before he became a government contractor and as others with whom he works can do.

Accordingly, in August 2008, he submitted a request for an Advisory Opinion to the FEC asking that he be allowed to make contributions, subject to the limitations in the laws applicable to individuals who are employees, not government contractors.  A copy of that request (less attachments) is attached to his declaration as Exhibit A.  By letter dated October 14, 2008, the FEC replied in an Advisory Opinion 2008-11, which rejected his request (Exhibit B to his declaration).   Brown is registered to vote in Maryland.  He would like to make federal political contributions in 2012, but is prohibited from doing so because of section 441c.

**Plaintiff Miller** is a licensed attorney who spent his entire career working for the federal government, mainly for the Office of General Counsel at USAID and its predecessor, until he retired in 2003. After he retired, he continued to work for the agency as a reemployed annuitant-consultant. For the first two years, he did essentially the same kind of work that he had done as an employee in the General Counsel's Office.  Also at the same time in 2003, he began to provide legal advice to the Peace Corps, another federal agency funded by Congress, where he continues to do work as a part-time

employee.  His position there is as a reemployed annuitant-consultant, which means that he accrues annual and sick leave and is paid at the GS-15 step 10 rate.

In 2005, Miller entered a contract with a different office within USAID, the Office of HIV/AIDS in the Global Health Bureau, where he has worked since then as a personal service contractor, on a part-time basis, providing policy advice.  His current contract runs until June 26, 2016, and pays him at a rate of $596 per day.  He earns vacation and sick leave, as he did when he was an employee, and the agency continues to treat him as an employee for federal tax purposes, paying the employer's share of Social Security and Medicare.  It also withholds his share of income, Social Security, and Medicare taxes, just as it did when he was a regular employee.  It is Miller's understanding that USAID currently has approximately 700 individuals under personal services contracts, which are generally similar to his, with approximately one-third of those individuals working in Washington and two-thirds at USAID missions overseas.

In each of the contracts that Miller signed with the Peace Corps and USAID, all of the contacts that he had in negotiating and/or implementing those contracts were with contracting officers, all of whom were agency officials, and none of whom was an elected federal officer or even an official appointed by the President.  His selection in each case was, he believes, based on the agency's knowledge of his work and because agency officials thought that he had the necessary skills, experience, and familiarity with its work that he could step in and do what needed to be done.  In each of the situations in which he has been a contractor-consultant, and in many of the positions in which he was an employee, he worked side by side with employees on the one hand, and contractual-consultants on the other, and the nature of the work performed by an individual rarely

varied depending on whether the person was an employee or a contractor.  In addition, sometimes the supervisor was an employee or officer, and in other cases, the supervisor was a contractor-consultant.

Miller currently works in the mornings for USAID as a contractor, subject to section 441c, and in the afternoons for the Peace Corps, as an employee, not subject to section 441c.  Like the other plaintiffs, Miller has not made any contributions in connection with federal elections since he became a contractor, but would like to provide financial support for candidates running for federal offices and/or their political parties, and be on record as giving money in the 2012 elections to the candidates that he believes would best represent him and his views and values in Congress and in the White House.

## ARGUMENT

**BECAUSE THE BAN IN SECTION 441C VIOLATES PLAINTIFFS' CONSTITUTIONAL RIGHTS, AND BECAUSE THE OTHER RELEVANT FACTORS FAVOR PLAINTIFFS, THE COURT SHOULD GRANT PLAINTIFFS A PRELIMINARY INJUNCTION.**

### I.  PRELIMINARY MATTERS

#### A.  The Standard for Issuing a Preliminary Injunction

The court of appeals for this Circuit in *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011), recently restated its test for the granting of a preliminary injunction.  As the court stated, granting preliminary relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  To obtain such an order, the plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* (*quoting Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) (brackets

added by court of appeals).  The court discussed whether a strong showing on one factor, such as irreparable harm, could outweigh a lesser showing on probability of success, but declined to decide that question because the plaintiff there could not prevail even under the less-demanding standard.  644 F. 3d at 393.

As we demonstrate below (Points II A & B), plaintiffs have a very strong case on the merits; indeed, depending on what response the FEC interposes, they may ask the Court to exercise its authority under Rule 65(a)(2) to consolidate a hearing on the preliminary injunction with a hearing on the merits.  Moreover, they readily satisfy the other three factors (Point III: they will suffer irreparable harm if they are not permitted to exercise their First Amendment rights during the 2012 election year; there will be no harm to the government because the contributions of these three plaintiffs will be subject to the same limits and restrictions as apply to every other individual who wishes to contribute to a federal election and thus cannot possibly have any effect on the outcome of any federal election or undermine any purpose behind section 441c; and supporting First Amendment activity is always considered by the courts to be on the side of granting preliminary relief.

### B.   The Legal Standards Applicable to the Constitutional Questions

The complaint raises two separate, but related, challenges to the constitutionality of the absolute ban in section 441c on the making of contributions in connection with federal elections by plaintiffs and other individuals who contract with federal agencies. Although the Supreme Court has well-established standards for assessing Equal Protection claims in many contexts, it has not ruled specifically on such challenges in the area of campaign finance.  Under *Buckley v. Valeo,* 424 U.S. 1 (1976), the right to make a

political contribution is protected by the First Amendment, and under *Kramer v. Union Free School District No. 15,* 395 U.S. 621, 626 (1969), the Court gave a restriction on voting "a close and exacting examination" because the law allegedly created an "unjustified discrimination in determining who may participate in political affairs. . . ." As the Supreme Court ruled in *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973), strict scrutiny is required when a law "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution." For these reasons, strict scrutiny should be applied to plaintiffs' Equal Protection claim, and the ban set aside unless defendant can show that section 441c serves a compelling governmental interest as applied to individuals such as plaintiffs and is narrowly tailored to achieve that end. *Kramer,* 395 U.S. at 633.

In ruling on First Amendment challenges in the campaign finance area, the Supreme Court has applied some form of heightened scrutiny to all restrictions on campaign spending, with bans or limits on expenditures subject to the highest level of scrutiny, and limits on contributions subject to a somewhat lesser degree of scrutiny. *Buckley,* 424 U.S. at 19-23. *See, e.g., Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011) ("after finding that the restriction at issue was 'closely drawn' to serve a 'sufficiently important interest,' . . . we have upheld government-imposed limits on contributions to candidates"). Section 441c is not a limit but a ban, applicable to only a small subset of potential contributors. Examining the reasons why the *Buckley* Court applied less than strict scrutiny to the limits there strongly suggests that a higher degree of scrutiny should apply to the ban here:

> "a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the

contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." 424 U.S. at 20-21 (footnote omitted).

We recognize that the Court has held that a ban on contributions by non-profit ideological organizations is *not* subject to strict scrutiny. *Federal Election Commission v. Beaumont,* 539 U.S. 146, 161-63 (2003) (applying "closely drawn" standard). However, the Court in *Citizens United v. Federal Election Commission,* 130 S. Ct. 876, 898 (2010), applied strict scrutiny to the ban on corporate independent expenditures, and it has never directly ruled on the standard governing a ban on contributions that is applicable only to some individuals. Moreover, in *McConnell v. Federal Election Commission,* 540 U.S. 93, 231-32 (2003), without deciding the level of scrutiny, the Court relied on the First Amendment to strike down a ban on all contributions by persons under the age of 18. However, when the Fourth Circuit was recently confronted with the question of whether a near-total ban on contributions by registered lobbyists was subject to strict scrutiny or the "closely-drawn" standard, it applied the latter. *Preston v. Leake,* 660 F.3d 726, 735 (4th Cir. 2011). In our view, there is a strong argument that can be made that all bans applicable to individuals should be subject to strict scrutiny. But regardless of whether the somewhat more relaxed version of heightened scrutiny employed by the Court in *Buckley* (upholding contribution limits), and in *Randall v. Sorrell,* 548 U.S. 230, 253 (2006) (setting aside limits as too low), or even the "closely drawn" standard in

*Beaumont*, is applicable, the ban in section 441c as applied to individuals such as plaintiffs cannot stand.

Finally, we note that in some cases the line between an Equal Protection claim and a claim based on another specific protection in the Constitution may not be clear. For example, in *Boddie v. Connecticut*, 401 U.S. 371 (1971), the Court struck down on Due Process grounds a law requiring the payment of a filing fee of $50 to obtain a divorce by persons unable to afford the fee, with Justice Douglas concurring on the basis of Equal Protection. *Id.* at 390. In other cases where both sets of claims are made, some members of the Court have relied on Equal Protection as a more narrow ground for decision. *Lawrence v. Texas,* 539 U.S. 558, 579-85 (2003) (O'Connor, J., concurring on Equal Protection grounds to majority decision on Due Process basis). Accordingly, because Equal Protection analysis requires strict scrutiny, we present that claim first, followed by the First Amendment claim, recognizing that, because the case involves First Amendment protected activities, there is considerable overlap between the two claims.

## II.  PLAINTIFFS HAVE A STRONG LIKELIHOOD OF PREVAILING ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.

### A.  SECTION 441C VIOLATES EQUAL PROTECTION.

Although the Supreme Court has had several cases challenging limits on campaign contributions, it has not analyzed them under the Equal Protection Clause. In many cases the limits applied to everyone (*Buckley* and *Randall*), and hence there was no basis for an Equal Protection challenge. In others, such as *Beaumont*, there was an Equal Protection question of sorts: whether non-profit corporations should be treated like individuals – as the Court had done for independent expenditures, *Federal Election Commission v. Massachusetts Citizens for Life,* 479 U.S. 238 (1986) – or whether they

should be treated like for-profit corporations that are prohibited by section 441b from making any contributions in federal elections.

The closest factual case is the portion of *McConnell, supra,* striking down the ban on contributions by persons under the age of 18. The Court, in theory, could have analyzed the law under Equal Protection and asked whether there is a basis for distinguishing between those over the age of 18 from those under that age. However, it decided the case solely under the First Amendment, finding the ban to be vastly over-inclusive and striking it down. 540 U.S. at 232 (suggesting, but not approving, alternatives such as "counting contributions by minors against the total permitted for a parent or family unit, imposing a lower cap on contributions by minors, and prohibiting contributions by very young children"). But in none of these cases did the Court discuss the issue in terms of the appropriate Equal Protection standard of review.

In the case of section 441c, the comparisons between plaintiffs and others similarly situated are readily apparent. There are, in fact, two groups of similarly situated persons who are more favorably treated than are the plaintiffs regarding the making of contributions in federal elections. The first includes (a) those individuals who work for federal agencies as employees rather than consultants. The second (b) is comprised of three sub-groups, each of which involves a corporation that, like plaintiffs, has a federal contract: (i) the corporations themselves because they, but not individuals, can establish political committees in their own name that can contribute to federal elections; (ii) the officers, directors, employees and stockholders of those corporations; and (iii) the individuals who control LLCs who contract with the federal government and who are, in

all meaningful respects, like plaintiffs, except that they are outside the reach of section 441c. We analyze those two groups in turn.

(a) *Federal Employees.* There is no law that prohibits federal employees from making contributions in connection with federal elections. Indeed, the applicable federal regulation expressly provides just the opposite: "An employee may make a political contribution to a political party, political group, campaign committee of a candidate for public office in a partisan election and multicandidate political committee of a Federal labor or Federal employee organization." 5 C.F.R. § 734.208(a). S*ee also* 5 C.F.R. § 734.202: "Employees may take an active part in political activities, including political management and political campaigns, to the extent not expressly prohibited by law and this part." There are also special rules for employees of seventeen sensitive agencies, such as the defendant FEC, the Federal Bureau of Investigation, and the Central Intelligence Agency, which are listed in 5 C.F.R. § 734.401. However, 5 C.F.R. § 734.404(a)(4) specifically allows even those employees to do what plaintiffs may not: "Make a financial contribution to a political party, partisan political group, or to the campaign committee of a candidate for partisan political office."[3]

Section 603 of Title 18 contains a very limited restriction, not on whether a contribution can be made, and not on what candidates or entities may benefit from such a

---

[3] Employees of the FEC are subject to a further restriction: they "may not request or receive from, or give to, an employee, a Member of Congress, or an officer of a uniformed service a political contribution." 5 U.S.C. § 7323(b)(1); 5 C.F.R. § 734.413(a). Like section 603, this appears to allow even FEC employees to contribute to a presidential candidate, a political party, or political committee for use in a federal election, as long as the person giving or receiving the contribution does not fall in a prohibited category. The FEC also acknowledges that it cannot further limit the right of its employees to make political contributions. *See* http://www.fec.gov/pages/fecrecord/december2011/standardsofconduct2011.shtml.

contribution, but only on who may solicit and/or receive such a contribution.  Thus, the prohibition applies only where "the person receiving such contribution is the employer or employing authority of the person making the contribution."  The precise scope of that limitation is not of significance.  What is clear is that it applies only where there is an employment relationship involving the contributor and the person "receiving" the contribution.  Thus, if a supervisor of a federal employee accepted a contribution from the employee to support a candidate for President, that would be a violation of section 603.[4]  But making a contribution directly to a presidential election committee, or to a political party or a political committee, would not be barred.  Far from being a limit on what federal employees may contribute, this provision appears to be principally aimed at protecting federal employees from being solicited by their supervisors, whose requests they may feel unable to decline.  And it is surely unrelated to the usual goal of contribution limits or bans, which is to protect against the appearance of corruption.  *Citizens United* at 908-10.[5]

There can also be no doubt that federal employees are similarly situated to individuals such as plaintiffs who have personal services contracts with federal agencies.  Both are paid by funds appropriated by Congress, and both perform work under the

_____

[4] The concern with supervisors soliciting subordinates is confirmed by specific federal rules prohibiting such conduct.  5 C.F.R. § 734.208(b)(4)(ii); 5 C.F.R. § 734.303(d) & 5 C.F.R. § 734.302(b)(3).  In addition, 5 C.F.R. § 734.306 contains a series of time, place, and manner prohibitions on participation by federal officers and employees in political activities generally, but none of them would prevent an employee from making a contribution except in those specific circumstances.

[5] Section 603 applies only when the person receiving the contribution is currently employed by the federal government, whereas section 441c bans contributions to any candidate for federal office, including, for example, those who are challenging an incumbent in a primary or to independent ideological political committees like Emily's List or the National Right to Life Committee.

direction of the heads of federal agencies and those who work for them.  As the declarations in this case demonstrate, plaintiffs and federal employees work literally side by side and perform many of the same duties – and do so interchangeably in many circumstances.  *See NASA v. Nelson,* 131 S. Ct. 746, 751 (2011) (in upholding requirement of a background check for individuals working under long-term government contracts who have access to federal facilities, the Court noted that their "duties . . . are functionally equivalent to those performed by civil servants" who already undergo such checks).  Plaintiffs Brown and Miller are retired employees from the same agency where they now are contractual consultants and are doing many of the same kinds of work that they did in their former work lives.  But when they were employees, Brown and Miller could make political contributions for federal elections, and now they would be felons if they did so.  Section 441c extends not only to part-time consultants like the plaintiff Wagner and to contractor-employees like plaintiffs Miller and Brown, but, as we read section 441c and understand its scope, to anyone who has a contract with any federal government entity, including individuals hired as expert witnesses (like Jonathan Tiemann), mediators for the Department of Justice, advisers in medicine, science, and economics, and law professors who serve as reporters to the various rules committees established by the Judicial Conference.  But, because plaintiff Miller's status with the Peace Corps is that of an employee, not a contractor, section 441c does not apply to him in that capacity.

   *(b) Contracting Corporations and Those Who Work for Them.*  The other comparison – with corporations that contract with federal agencies and their officers, directors, employees, and stockholders – is slightly more complex and also discriminates

against plaintiffs and other individuals with government contracts.  Although corporations with government contracts cannot make contributions in connection with federal elections, neither can corporations that do not have such contracts.  Subsection 441b(a).  But both may establish separate segregated funds that can make contributions in connection with federal elections, and the law allows the corporate sponsor to administer the fund, including paying for the solicitation of money to be used by the fund to make those contributions.  However, the provision authorizing the establishment of those funds for contractors, subsection 441c(b), applies only to a "corporation, labor organization, membership organization, cooperative, or corporation without capital stock" and not to an individual.  Thus, although corporations cannot make contributions from their treasuries, they can spend their treasury money to establish and administer their separate funds, which can make those contributions.  Section 441b(b).  Individuals do not have that same outlet.  Indeed, the ban in section 441c does not simply forbid an individual using money received under a government contract from making a contribution.  The ban is absolute and is not tied in any way to the source of the money, as the FEC made clear in its response to plaintiff Brown's request for an advisory opinion (Exhibit B to Brown declaration).  Thus, if an individual had inherited $10,000 from a parent and placed it in a separate account even before becoming a government contractor, section 441c would bar the use of those funds to make political contributions for federal elections, whereas a corporation can use "outside" (non-treasury) money to fund its PAC.

As discussed in the First Amendment argument, *infra,* the apparent purpose of section 441c is to supplement bribery laws and eliminate the appearance of any possible *quid pro quo* in the award, administration, and oversight of government contracts.  It does

that by banning contracting parties from making contributions to persons who, in least in theory, are in a position to influence the award, performance, or payment under such contracts.  But permitting contracting corporations to set up separate funds to make identical donations significantly undermines that rationale and, relevant to this Equal Protection claim, actually places corporations in a *better* position to influence the award, performance, and payment for government contracts than individual contractors like plaintiffs who cannot establish such funds.

To the extent that section 441c is aimed at preventing the appearance of undue influence in the government contracting process, another provision of FECA makes the ability of a corporation but not an individual to create a separate fund even more irrational.  In order that there is no uncertainty about the connection between such separate funds and the entity that sponsors them, Congress provided in 2 U.S.C. § 432(e)(5) that "[t]he name of any separate segregated fund established pursuant to section 441b(b) of this title shall include the name of its connected organization."  Thus, for example, while subsection 441c(a) would prevent The Boeing Company – one of the largest federal government contractors – from making a contribution, subsection 441c(b) would permit the same contribution to be made by Boeing's separate segregated fund, as long as the fund properly identified The Boeing Company as its sponsor.  In *Citizens United*, the FEC defended a law that favored individuals over corporations and lost.  We know of other no law in the field of campaign finance that favors corporations over individuals, let alone one that has been sustained.  Because section 441c prefers corporations over individuals, it cannot stand.

Not only may corporations use their named PACs to make contributions, but individuals who work for federal corporate contractors are outside the ban.  Thus, the President of Boeing, its chief contract negotiator with the Department of Defense ("DOD"), and/or those individuals in charge of implementing the contract with DOD, can all make contributions in connection with federal elections, just like any other individual. If the supposed concern about the appearance of a *quid pro quo* for the contract would not exist in that situation under section 441c, even though the identify and occupation of the contributor are matters of public record, it is impossible to explain why plaintiffs who have individual contracts with federal agencies should nonetheless be forbidden from making similar contributions.

The discrimination against plaintiffs and other individual contractors does not end there.  As shown by the declaration of Jonathan Tiemann, who has an expert witness contract with the Department of Labor, some individuals who perform personal services contracts for the federal government choose to incorporate and establish limited liability companies (LLC) or whatever the equivalent is under the laws of the state where they live.  In his case, and in most others (see declarations of Jeffrey S. Lubbers and Steven L. Schooner), the agency does not care whether the contract is with the individual personally or with his LLC.  In most cases involving LLCs, the person who is performing those services is the sole stockholder, officer, and/or employee.  Federal agencies contract with such personal services corporations on the understanding that the individual who owns and runs the corporation will perform the services.  Thus, for operational purposes, it makes no difference to the agency whether an individual has formed an LLC or enters a contract with the agency directly.  But it does matter for purposes of section 441c because

the FEC has ruled – correctly in our view – that the ban on contractor contributions applies only to the entity that is the contracting party, but not to its stockholders, directors, officers, or employees. 11 C.F.R. § 115.6.[6]

　　If plaintiff Wagner were willing to go to the not inconsiderable trouble and expense of setting up and maintaining an LLC and contracting in its name (*see* Tiemann declaration), she could make all the contributions federal law would allow, and section 441c would be no barrier even if the sole source of her contributions was her earnings under her government contract.  That is because, as noted above, the ban is not a ban on the source of funds, but on whether the person making the contribution is the same person who holds the government contract.  AO 2008-11, p. 3 (ban applies to plaintiff Brown whether contribution is made "from his business or personal funds," *citing* 11 C.F. R. § 115.5: ban applicable to individuals applies to contributions made "from their business, personal, or other funds under their dominion or control").[7]

　　Nor can it be argued that plaintiffs should have to create personal services corporations to avoid section 441c.  That argument is foreclosed by the decision in *Citizens United,* which rejected as unduly burdensome a claim that large for-profit

---

[6] Connecticut avoided this particular Equal Protection problem by extending its ban on contractor contributions to certain high ranking officers of the contractor as well as their close family members (also not included under section 441c, *see* 11 C.F.R. § 115.5).  *See Green Party v. Garfield,* 616 F.3d 189, 202 (2nd Cir. 2010).  There is no mention in the opinion of state employees, perhaps because the state does not make extensive use of individual contractors to perform state functions, and no Equal Protection claim appears to have been raised there.

[7] In all likelihood, because plaintiffs Miller and Brown provide services to their agencies on an ongoing basis, their agency would not approve a contract with an LLC of theirs, if they had one.  But that has nothing to do with any possible rationale behind section 441c and the other discriminations that it fosters, all of which make it unconstitutional as applied to plaintiffs Miller and Brown.

corporations could be required to establish separate segregated funds as an alternative to making expenditures from their treasury, without any showing of the specific costs involved.  130 S. Ct. at 897-98;  *see also Federal Election Commission v. Massachusetts Citizens for Life,* 479 U.S. 238, 253-56 (1986) (rejecting similar claim as applied to non-profit corporations and explaining the burden of operating such funds).  Surely, no individual who wishes to perform personal services for a federal agency should have to spend the time and money to establish and maintain an LLC just to avoid section 441c.

*Kramer v. Union Free School District,* 395 U.S. 621 (1969), presents analogous Equal Protection issues involving the right to vote.  There is no express provision in the Constitution conferring on any person the right to vote for government officials.  However, the Court in *Kramer* held that allowing some individuals to vote for a particular office, while denying others that opportunity, presented Equal Protection claims that would be evaluated under strict scrutiny, at least with respect to elections for general governmental bodies, which surely would include the President and Members of Congress, who are covered by section 441c.  In *Kramer*, the election was for a local school board, and only persons who owned or leased property in the school district, or who had children (whether in the public schools or not) could vote in that election.  The plaintiff in *Kramer* was a 31 year-old childless stockbroker who lived with his parents in the district and was otherwise eligible to vote.  Relying on the Equal Protection Clause, the Court found the restriction on voting in school district elections to be unconstitutional where there were no relevant differences between those who were allowed to vote and Mr. Kramer.  Because the right to vote and the right to make contributions to candidates for elected office are both integral parts of the political process, *Kramer* strongly supports

plaintiffs' Equal Protection claims here.  Preferring either federal employees over

individual consultants in the making of contributions in federal elections, or preferring

the stockholders, directors, officers, and employees of contracting corporations over

individuals such as plaintiffs is a violation of Equal Protection.  The combination of both

makes section 441c doubly unconstitutional as applied to individuals who have contracts

with federal agencies.

### B.  THE BAN IN SECTION 441C, AS APPLIED TO INDIVIDUALS, VIOLATES THE FIRST AMENDMENT.

Even if section 441c did not discriminate invidiously against plaintiffs and other

individuals who hold government contracts, the total ban on their making of contributions

in connection with federal elections would be unconstitutional under the First

Amendment, which is a general limit on all laws regulating political contributions and

expenditures.  *Buckley*, 424 U.S. 14-23.  That is because the burdens that section 441c

imposes are not narrowly tailored to serve any public purpose addressed by the law.

Unlike most other campaign contribution laws applicable to individuals, section 441c is

not a limitation, but is an absolute prohibition on the making of any contributions for

federal election purposes as long as the plaintiffs have contracts with the federal

government.  Given the other limits applicable to everyone who wishes to contribute to

federal elections – which Congress apparently believed were sufficient to avoid any

appearance of corruption for everybody else –  defendant has a heavy burden to explain

why those generally applicable limits are not also sufficient as applied to plaintiffs.  And

in seeking to sustain that burden, the "Supreme Court has recognized only one interest

sufficiently important to outweigh the First Amendment interests implicated by

contributions for political speech: preventing corruption or the appearance of corruption."

*SpeechNow.org v. Federal Election Commission,* 599 F.3d 686, 692 (D.C. Cir. 2010) (en banc).

Three recent decisions, involving laws in Colorado, Connecticut, and New York City, discuss the rationale for statutes such as section 441c. *Green Party v. Garfield,* 616 F.3d 189 (2d Cir. 2010); *Dallman v. Ritter,* 225 P.3d 610 (Col. 2010); and *Ognibene v. Parkes,* 2012 WL 89358 (2d Cir. Jan 12, 2012), *superseding* 2011 WL 6382451. Especially at the state and local level, many elected officials have a significant and often highly discretionary role to play in influencing who is awarded government contracts, some of which are quite lucrative. One way that potential government contractors devised to increase their chances of success was to make contributions to the campaigns of the elected officials who influence the awarding of government contracts. Plaintiffs agree that a prohibition on making a contribution to a candidate who may be involved in the decision-making for a government contract, for which the contributor is currently bidding or performing, might, if properly drawn, be justified as a means of avoiding corruption or the appearance of corruption. However, section 441c is not such a law.[8]

The principal reason that section 441c cannot be saved under that rationale is that there is no nexus between the persons or entities to whom contributions might be made – candidates for President/Vice President and Members of Congress, political parties and

---

[8] Even that kind of a law might be struck down because there is a less restrictive alternative: impose a ban on entering a contract with anyone who has made a contribution to a candidate who is elected to an office that has a role in deciding who is to receive that contract. In that form, the law would operate more like a recusal statute and not a ban on speech. *Compare Caperton v. A. T. Massey Coal Co.,* 556 U.S. 868 (2009) (Due Process recusal of judge based mainly on very large independent expenditures that could not be constitutionally limited). *See also Blount v. Securities & Exchange Commission,* 61 F.3d 938 (D.C. Cir. 1995) (upholding SEC rule prohibiting municipal securities brokers from engaging in municipal securities business for two years after contributing more than $250 to election of officials from whom they seek to obtain business).

political committees – and the persons making decisions on government contracts, both generally and for the specific contracts under which plaintiffs are currently serving federal agencies. Almost all federal government contracts are entered into at the agency level, and pursuant to 48 C.F.R. §1.601(a), designated agency officials have the authority to approve a contract, oversee its implementation, and determine payments. There is simply no role envisioned for the President or Members of Congress in the awarding of personal services contracts, and they had no role in the approval of the contracts of these plaintiffs. It is possible that some large or important contracts, in an agency such as DOD, may be so significant that the President or some Members of Congress may have a role in the procurement process, even if the formal approval is made by the agency. But small-dollar personal services contracts with individuals such as these plaintiffs do not fall into that category. And, of course, section 441c is not limited to the very large contracts that attract political attention, and therefore at least fails the "closely drawn" standard in *Beaumont* and other Supreme Court decisions.

The Connecticut law upheld in *Garfield* is an example of a much more narrowly tailored provision. First, there was a sordid recent history in that State of contractors making very generous campaign contributions (and sometimes other gifts that might have constituted bribes) to officials charged with the award of state government contracts, and receiving benefits in return, with state officials, including the Governor, going to prison. 616 F.3d at 193. Indeed, it was the lack of a similar history that was cited by the court in setting aside a similar ban on lobbyists to the one it upheld for contractors. *Id.* at 205-07. Second, the law was, with some exceptions, "branch specific": if a contract was let by the Governor or others in the executive branch, then the contribution ban applied only to

executive branch officials.  The same was true for contracts requiring legislative approval.  *Id.* at 194. Third, although upholding the entirety of the contractor ban, the court viewed the ban applicable to principals of a corporate contractor as "bordering on overbroad," *id.* at 203, but, in light of this recent history of massive corruption involving state contracts, gave the legislature leeway in dealing with the problem.  Similarly, it upheld the ban as applied to spouses and dependent children based on the rationale of preventing circumvention: the contracting spouse could otherwise give money to the other spouse – often with the same last name – and have the contribution made in the other spouse's name.  *Id.* at 203-04. Thus, broader coverage was a help, not a hindrance, to upholding the law because it supported the stated purpose of the statute, rather than undermining it.

Here, by contrast, the ban in section 441c applies to contributions to candidates who will never have any power to approve any contract (let alone of the kind that the particular plaintiff has or will be seeking), as well as to political parties and political committees that are not government actors, and so by definition cannot approve government contracts.  *Cf. Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 296-97 (1981) (distinguishing contributions to a candidate from contributions to a ballot initiative committee for First Amendment purposes because committee has no power to make decisions whereas states may properly conclude that "large contributions are given to secure a political quid pro quo from current and potential office holders").

The rather different Colorado law, by contrast, was struck down because it was not "closely drawn" to meet the goal of avoiding the appearance of corruption which the court said was legitimate.  In one respect, it was quite narrow as it applied only to "sole

source" contracts, above $100,000 (indexed for inflation), which included only those for

which no more than three bids were received.  225 P.3d at 618.  But the law applied to

local "sole source" contracts, which created problems because in rural areas there was

often only one bidder, and in some cases, the product or service could be obtained from

only one company.  *Id.* at 626-27.  For that reason, the court found the law to be not

closely drawn to avoid the appearance of corruption, as required by *Buckley*.  *Id.*  It also

found overbreadth because the law applied, as does section 441c, to contributions to

political parties and to all candidates for office, regardless of their connection to the

contributor's actual or potential contract.  While accepting the notion that some

contributions can lead to the appearance of corruption, the court found that this law swept

much too broadly because it incorrectly assumed that "a small contribution to a candidate

for the general assembly automatically leads to a public perception that the donor will

receive some quid pro quo benefit from a city or special district with which the donor

holds a sole source contract."  *Id.* [9]

 Compared to the Connecticut and Colorado statutes, section 441c is much more

like the vastly over-inclusive ban on contributions by persons under the age of 18 struck

---

[9] The State defended its law by relying on section 441c, but the court rejected that
defense.  *Id.* at 628. The court suggested that section 441c was saved because of the
option of the separate segregated fund, *id.*, but that would not save the application of
section 441c to individuals such as plaintiffs.  The Colorado law appears to cover
individuals as well as corporations, but since the court found it overbroad on other
grounds, it did not have to reach its viability as applied to individuals, even those with
sole source contracts over $100,000.  The court also suggested, without citation or
explanation, that section 441c "addresses only a limited number of contracts and applies
only to members of Congress, the President, and the Vice President, thus tailoring its
restrictions to individuals with oversight responsibility." *Id.*  Aside from this serious
mischaracterization of federal law, a state court's view on the constitutionality of a
federal statute is not entitled to any deference by this Court.  Moreover, *Dallman* did not
raise an Equal Protection claim as have plaintiffs here.

down under the First Amendment in *McConnell*.  The reason for that law was that some parents, after reaching their contribution limits, would make gifts to their children, who would then make contributions in their own names, using their parents' money.  The Court agreed that Congress could legitimately act to prevent that kind of conduct, but set aside the law because of the serious mismatch between it and the problem.  540 U.S. at 231-32.  Like section 441c, it was an absolute ban so that a child who saved her allowance or held a part-time job was forbidden from giving even $1 to a favorite candidate for President.  Similarly, small contributions are not a source of corruption or even the appearance of corruption, but there was no amount that any person under the age of 18 could give.  Furthermore, it might be reasonable to assume that a toddler was not making an independent decision to make a $2000 contribution, but a teenager who gave $25 would be in a different situation.  In short, the mismatch was too great to overcome a First Amendment challenge. The same is true for section 441c.

Nor is the Second Circuit's decision in *Ognibene* of any assistance to the FEC here.  For purposes of this case, and without including all of its nuances, the New York City law at issue there has two features that the FEC may argue are relevant: those individuals who are "doing business" with the City are subject to lower limits on campaign contributions (but not a ban like section 441c), and their contributions are not eligible for the 6 to 1 match that is available for up to $175 in contributions to participating candidates.  2012 WL 89358 *3.  Lobbyists are not subject to the lower limits, but their contributions are also ineligible for a match.  In order to fall within the "doing business" category, a person, which includes firms and individuals, must have had more than $100,000 worth of business within a certain period of time, with certain

exclusions.  *Id.*  Corporations are forbidden from making contributions, there is no

provision for PACs to make contributions, and the limits and bans at issue in *Ognibene*

apply to certain individuals (and their spouses or domestic partners) in positions of power

and responsibility in the "doing business" firms and for lobbying organizations.  *Id.*  The

law does not appear to be applicable to contractors like plaintiffs Brown and Miller,

although that is not entirely clear since no one in their position was a plaintiff.  A person

in the position of plaintiff Wagner would appear to be potentially covered by the law, but

because her contract is for only $12,000, she would be excluded from the definition of

"doing business" with New York City.

      *Ognibene* does not support the application of section 441c to these individual

plaintiffs for several reasons.  First, unlike section 441c, there was no absolute ban on

contributions.  Anyone covered by the law could still make a contribution, although in a

substantially diminished amount and without it being eligible for matching.  Those are

serious restrictions, but they are not a total ban.  Second, there was no Equal Protection

claim made in *Ognibene*, probably because the law did not create the kinds of anomalies

discussed above; it probably did not cover persons like plaintiffs Miller and Brown (if

they exist in the New York City government); and the threshold of $100,000 would

exclude most consultant-contractors like plaintiff Wagner.  Third, the law being

challenged was the result of a series of incremental changes, backed by studies and

reports that followed on the heels of local scandals, *id.* *1-2, and was carefully crafted to

avoid the problems of over- and under- inclusion found in section 441c.  Plaintiffs take

no position on whether *Ognibene* was correctly decided or whether a law like that, at the

federal level, would be constitutional.  Whatever the answer is to those questions, section

441c is so different from the New York City law in *Ognibene* that it cannot support the FEC here.

The FEC may also rely on *Preston v. Leake,* 660 F.3d 726 (4th Cir. 2011), which upheld against a First Amendment, but not Equal Protection, challenge a near-total ban on contributions by registered lobbyists in North Carolina, but not by government contractors such as these plaintiffs.  The decision turned on recent findings by the North Carolina legislature as to the potential for corruption and the appearance of corruption by lobbyists on the legislative process.  *Id.* at 729. There are no such findings here, but even if there were, it would not save section 441c as applied to individuals such as plaintiffs. The lobbyists in North Carolina were seen to have the potential to influence the State's public policy to favor their clients.  By contrast, plaintiffs are, in essence, little more than government employees who have no means to influence Congress or the President through campaign contributions to candidates, parties, and political committees that have nothing to do with their contracts, or otherwise affect public policy in the way that lobbyists can*.*  Indeed, the plaintiff in *Preston* agreed that the rationales offered by the state were sufficient to sustain the general application of the law (a concession that plaintiffs do not make here), but argued that there should be an exception for small contributions of the kind that she wished to make.  *Id.* at 735-36.  Finally, the ban in *Preston* was not complete since, unlike under section 441c, lobbyists were entitled to contribute to PACs (up to $4000 under N.C. Stat. 163-278.13(a)) and to make recommendations as to the candidates to which their contributions should be made, without violating the law. *Id.* at 740**.**

There is yet another important respect in which section 441c is under-inclusive, beyond the Equal Protection claims that plaintiffs have raised. Procurement contracts are only one of the important ways that the Government dispenses money to persons outside the Government, but contracts are the only one covered by section 441c or any other ban on political contributions. This is the case even though other payments are also, in the language of section 441c(a), "made in whole or in part from funds appropriated by the Congress." In 2 C.F.R. § 180.970, the Office of Management and Budget has issued guidelines for non-procurement transactions that distinguish them from procurement contracts. That section defines non-procurement transactions to include "grants", which would appear indistinguishable from contracts with regard to the concern that allegedly animates section 441c – preventing undue influence on decisions about who receives federal funding. In both situations, the Government has agreed to pay what may be a substantial sum of money to a person outside the Government to undertake certain activities that the Government wants performed. To be sure, the agency awarding a grant will not receive personal services, goods, or materials as it would under a contract, but the grant will advance a governmental purpose, and one or more human beings will use the money to carry out the activity that the Government wants performed. It does not take much imagination, under the approach taken in section 441c, to understand why a person seeking a grant might believe that his or her chances of obtaining it are enhanced by making a contribution in a federal election, but grants are not covered by section 441c.[10]

---

[10] The New York City law at issue in *Ognibene* applied to grants in excess of $100,000. 2012 WL 89358 *3. In fact, plaintiff Wagner is also a co-grantee from the National Science Foundation under a federal grant in the amount of $45,721.

Similarly excluded, with similar potentials for the appearance of *quid pro quo*, and also treated like grants under section 180.970, are such financial benefits as loans, loan guarantees, subsidies, and "payments for specified uses."  Moreover, although not specifically mentioned among the excluded transactions, but for which there is a significant possibility that a campaign contribution would actually matter, is admission to one of the tuition-free military academies.  *See e.g.* 10 U.S.C. §§ 6954(a); *United States Naval Academy, http://www.usna.edu/Admissions/steps4.htm.*  Among those persons who can make nominations are Members of Congress and the President and Vice President, to whom contributions can actually be made (unlike the heads of the agencies that hired plaintiffs). Except perhaps for the service academy nominations, these other transactions would, if included under section 441c, raise similar mismatch issues as do the individual contract claims made in this case.  But the failure to include them, even though they have similar pay-to-play potentials as government contracts, further suggests that the rationale offered to defend section 441c is not sufficiently tailored to sustain its constitutionality against this First Amendment challenge.  As this Court observed in a related context in *United States v. National Treasury Employees Union,* 513 U.S. 454, 477 (1995): "The speculative benefits the honoraria ban may provide the Government are not sufficient to justify this crudely crafted burden on respondents' freedom to engage in expressive activities.  Section 501(b) violates the First Amendment."

### III.   THE FACTORS OTHER THAN LIKELIHOOD OF SUCCESS ON THE MERITS ALL SUPPORT PLAINTIFFS' MOTION.

As noted above, in order to obtain a preliminary injunction, the plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips

in his favor, and [4] that an injunction is in the public interest."  *Sherley,* 644 F. 3d at 392.

As we now show, these non-merits factors also point decidedly in plaintiffs' favor.

Even if section 441c is not technically a prior restraint on speech, it has the clear

effect of forbidding plaintiffs from making a contribution of as little as $1 until the law is

enjoined, because they are unwilling to risk being indicted as felons for exercising what

the Supreme Court has recognized at least since *Buckley* is a right of free speech.  And

because a preliminary injunction is the only way that plaintiffs will be allowed to make a

contribution in connection with the 2012 elections for President and Congress, denying

them that right creates a harm that cannot be remedied after November 2012.  It is not

that plaintiffs expect that their contributions will alone influence the outcome of the 2012

elections that makes them wish to contribute; rather they wish to use their contributions

to make public statements of support in this crucial election year.  Thus, factor [2] weighs

heavily in plaintiffs' favor.

In this case factors [3] and [4] meld into one because the defendant FEC has no

independent interest in enforcing the law beyond the public interest that the law is

intended to advance.  Regarding these factors, it is important to note that this is not a

class action, and that any preliminary relief will not extend to anyone other than these

three plaintiffs.  Moreover, plaintiffs will still remain subject to all of the other rules and

limits under FECA applicable to all other voters and others who are eligible to contribute,

so that there is no possibility that plaintiffs' individual contributions will have any impact

on a political campaign in which billions of dollars are likely to be spent.  Furthermore,

plaintiffs Miller and Brown have contracts that last for several years, and it is

inconceivable that a contribution made by them now could increase their chances of

having their contracts renewed in the future, especially where the persons at their agency with the power to approve their contracts are not the direct or even indirect beneficiary of any such contribution (assuming that they even became aware of them). And while plaintiff Wagner's contract will conclude sometime in 2012, she has no short-term plans to seek another one from ACUS, nor is it remotely possible that anyone at that obviously non-political agency would pay any attention to a law professor's political contribution in deciding to whom a contract of no more than $12,000 should be awarded. Moreover, as we explained above, all of the major corporations that hold federal government contracts are able to make contributions to federal elections by using their sponsored PACs and by having their officers, directors, and stockholders contribute, and it is only individuals such as plaintiffs who are subject to the ban in section 441c.

Finally, in weighing the public interest at stake in this motion for a preliminary injunction, the court of appeals has made clear that where First Amendment interests are in the balance, that tips the scales in favor of granting the relief. *O'Donnell Construction Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) ("issuance of a preliminary injunction would serve the public's interest in maintaining a system of laws free of unconstitutional [restrictions]"). *See also People for the Ethical Treatment of Animals v. Gittens*, 215 F. Supp. 2d 120, 134 (D.D.C. 2002): "the public interest favors a preliminary injunction whenever First Amendment rights have been violated;" *Stewart v. District of Columbia Armory Bd.*, 789 F. Supp. 402, 406 (D.D.C. 1992) ("Whatever public interest there may be [on the other side], the public clearly has an interest in free speech. The public interest in this case will be served by ensuring that plaintiffs' First Amendment rights are not infringed before the constitutionality of the regulation has been

definitively determined.").   As Chief Justice Roberts stated in *Federal Election Commission v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 474 (2007), a case involving restrictions on campaign spending, "Where the First Amendment is implicated, the tie goes to the speaker, not the censor."

++++++++++++++++++++

Because plaintiffs have shown a strong likelihood of success on each of their legal claims, and because the continued application of section 441c would irreparably deny plaintiffs the ability to make contributions to the candidates and parties of their choosing during this election year, without in any appreciable way harming any legitimate public interest, plaintiffs have met the test for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should grant plaintiffs' motion for a preliminary injunction and enter the proposed order submitted with this motion.

Respectfully submitted,

/s/ Alan B. Morrison
Alan B. Morrison
D. C. Bar No. 073114
George Washington Law School
2000 H Street NW
Washington D.C. 20052
(202) 994 7120
(202) 994 5157 (fax)
abmorrison@law.gwu.edu

/s/ Arthur B. Spitzer
Arthur B. Spitzer
D.C. Bar No. 235960
American Civil Liberties Union of
 the Nation's Capital
4301 Connecticut Ave, N.W.,
 Suite 434
Washington, D.C. 20008
(202) 457 0800
(202) 452-1868 (fax)
artspitzer@gmail.com

January 31, 2012