**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WENDY WAGNER,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 11-1841 (JEB)** |
| **FEDERAL ELECTION COMMISSION,** | |
| **Defendant.** | |

<u>**MEMORANDUM OPINION**</u>

For over seventy years, federal contractors have been barred from donating to candidates, political committees, and parties in connection with federal elections. The ban on such contributions guards against "pay-to-play" arrangements, in which people seeking federal contracts provide financial support to political candidates in return for their help securing government business. It also protects such contractors from pressure to contribute or risk losing their work.

Plaintiffs here are three individual federal contractors who have brought this suit alleging that the prohibition on political contributions violates, on its face, both the First Amendment and the equal-protection guarantee of the Fifth Amendment. They have now moved for a preliminary injunction to prevent the Federal Election Commission from enforcing the ban until a final determination has been reached in this action. Because Plaintiffs do not have a likelihood of success on the merits of either claim, the Court will deny their Motion.

I.      **Background**

The Federal Election Campaign Act, 2 U.S.C. § 431 *et seq.*, regulates the use of money in federal elections. Under Section 441c(a) of the Act, any person who is negotiating for, or

1

performing under, a contract with the federal government is banned from making a contribution

to a political party, committee, or candidate for a federal office, and from knowingly soliciting

such a contribution.  Specifically, the Act reads:

> (a) Prohibition
> It shall be unlawful for any person--
>
> (1) who enters into any contract with the United States or any department or agency thereof either for the rendition of personal services or furnishing any material, supplies, or equipment to the United States or any department or agency thereof or for selling any land or building to the United States or any department or agency thereof, if payment for the performance of such contract or payment for such material, supplies, equipment, land, or building is to be made in whole or in part from funds appropriated by the Congress, at any time between the commencement of negotiations for and the later of (A) the completion of performance under; or (B) the termination of negotiations for, such contract or furnishing of material, supplies, equipment, land, or buildings, directly or indirectly to make any contribution of money or other things of value, or to promise expressly or impliedly to make any such contribution to any political party, committee, or candidate for public office or to any person for any political purpose or use; or
>
> (2) knowingly to solicit any such contribution from any such person for any such purpose during any such period.

2 U.S.C. §§ 441c(a)(1)-(2).

While the provision does not explicitly exclude state and local elections, the FEC has

interpreted it to apply exclusively to federal elections – *i.e.*, campaigns for President, Vice

President, Member of the U.S. House of Representatives, U.S. Senator, and (non-voting)

Delegate or Resident Commissioner.  See 11 C.F.R. § 115.2(a); Dallman v. Ritter, 225 P.3d 610,

628 (Colo. 2010).  A knowing or willful violation of § 441c(a) is a crime and, depending on the

amount of money at issue, can result in a fine or imprisonment of up to five years.  2 U.S.C. §

437g(d)(1)(A).

Plaintiffs in this case are three individuals who have contracts with federal agencies and are therefore subject to § 441c's ban on political contributions.  <u>See</u> Motion to Certify Facts, Exh. 2 (Declaration of Wendy E. Wagner), ¶ 3; Exh. 3 (Declaration of Lawrence M. E. Brown), ¶ 5; Exh. 4 (Declaration of Jan W. Miller), ¶¶ 5, 7.   Each of them wishes to donate to candidates, parties, or committees in connection with federal elections in 2012, but is forbidden by law from doing so because of his or her contract.  <u>See</u> Wagner Decl., ¶ 6; Brown Decl., ¶¶ 7-8; Miller Decl., ¶ 7.

FECA contains an unusual judicial-review provision that permits expedited *en banc* review of constitutional challenges to the Act by the United States Court of Appeals for the circuit involved.  2 U.S.C. § 437h.  Plaintiffs initially sought such review, moving this Court to certify constitutional questions to the D.C. Circuit for its review, as required by § 437h.  <u>See</u> Compl., ¶ 4 ("[T]his Court has jurisdiction over the case under 28 U.S.C. § 1331 and 2 U.S.C. § 437h, but only to make necessary findings of fact and then to certify the constitutional issues in the case immediately to the United States Court of Appeals for the District of Columbia Circuit to be heard by that Court en banc"); Motion to Certify Facts.  The parties subsequently agreed, however, to abandon this course and decided, instead, that Plaintiffs would pursue their constitutional challenge as an ordinary case in the district court.  <u>See</u> Motion for Preliminary Injunction at 1-2.

Plaintiffs, accordingly, filed an Amended Complaint on January 31, 2012.  They allege that § 441c's ban on contributions to federal elections is facially unconstitutional as it applies to individual government contractors (as opposed to corporations).  <u>See</u> Compl., ¶ 1. Specifically, they contend that the ban violates the First Amendment and the equal-protection guarantee of the

Fifth Amendment.  Id., ¶¶ 15-19.  Plaintiffs now seek a preliminary injunction barring the FEC from enforcing § 441c against them during the pendency of the case.  After reviewing the parties' pleadings, the Court also held a hearing on the preliminary injunction on March 22, 2012, and it now issues this Opinion.

## II.    Legal Standard

A preliminary injunction "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 376 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  Id. at 374.  Before the Supreme Court's decision in Winter, courts weighed the preliminary injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another.  See Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360-61 (D.C. Cir. 1999).  This Circuit, however, has suggested, without deciding, that Winter should be read to abandon the sliding-scale analysis in favor of a "more demanding burden" requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm.  Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011); see also Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009).

Whichever way Winter is read, it is clear that a failure to show a likelihood of success on the merits is alone sufficient to defeat a preliminary injunction motion.  In Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dept. of Agr., 573 F.3d 815 (D.C. Cir. 2009), a case that postdates Winter, the court decided that it "need not proceed to review the other three preliminary injunction factors" because the plaintiff had "shown no likelihood of success on the merits."  Id. at 832;  see also

4

Apotex, Inc. v. Food and Drug Admin., 449 F.3d 1249, 1253 (D.C. Cir. 2006) (pre-Winter case holding no need to address other preliminary injunction factors where plaintiff had little likelihood of succeeding on the merits); Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 304 (D.C. Cir. 2006) ("[A] preliminary injunction will not issue" upon showing of irreparable harm unless plaintiffs also satisfy other three preliminary injunction factors; "Unsupported or undeveloped allegations of government establishment, for example, while sufficient to make out irreparable injury, will not withstand scrutiny concerning the movant's likelihood of success on the merits, thereby defeating a request for preliminary injunction.").  It follows that, upon finding that a plaintiff has failed to show a likelihood of success on the merits, the Court may deny a motion for preliminary injunction without analyzing the remaining factors.

## III.   Analysis

In line with this framework, the Court looks first at Plaintiffs' likelihood of success on the merits for each claim – First Amendment and equal protection.  Because it finds Plaintiffs have failed to satisfy that prong, it does not consider the other preliminary injunction factors in ruling on this Motion.

### A.   First Amendment

#### 1.   *Standard of Review*

The first task to undertake in assessing Plaintiffs' challenge under the First Amendment is to determine what standard the Court should apply.  There is no question that campaign contributions are a form of association protected by the First Amendment.  See Buckley v. Valeo, 424 U.S. 1, 22 (1976) (FECA's contribution limits "impinge on protected associational freedoms"); see also Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 387 (2000) (discussing impact of contribution limits on association right).  Many restrictions on First

Amendment freedoms are analyzed under the "strict scrutiny" standard, which requires that the restriction be narrowly tailored to serve a compelling government interest.  See, e.g., Citizens United v. Federal Election Commission, 130 S. Ct. 876, 898 (2010) (ban on independent corporate expenditures for political communication – as opposed to campaign contributions – subject to strict scrutiny); FEC v. Wisconsin Right to Life, Inc., 551 U.S. 449, 457, 464 (2007) (applying strict scrutiny to law prohibiting labor unions and unincorporated entities from paying for "electioneering communications" from their general treasury funds).  In fact, Plaintiffs initially suggested in their Motion that § 441c's ban on political contributions is also subject to that standard.  See Mot. at 16-17.  They concede in their Reply, however, that the appropriate standard is the lesser "closely drawn" scrutiny.  See Reply at 12-13; see also Hrg. Tr. at 7; Federal Election Commission v. Beaumont, 539 U.S. 162 (2003) (noting that the closely drawn standard is less demanding than strict scrutiny).

Under that form of heightened scrutiny, a restriction on First Amendment freedoms passes constitutional muster only if it is "'closely drawn to match a sufficiently important interest.'"  Beaumont, 539 U.S. at 161 (quoting Nixon, 528 U.S. at 387-88 (quoting Buckley, 424 U.S. at 25) (internal quotation marks omitted)); see also Arizona Free Enterprise Club's Freedom Club PAC v. Bennett 131 S. Ct. 2806, 2817 (2011) (reaffirming that closely drawn standard for campaign contributions remains valid after Citizens United).  Even though Beaumont concerned a contribution limit, whereas this case involves a ban, the standard of review is the same.  The level of scrutiny depends on "the importance of the 'political activity at issue' to effective speech or political association," not the degree to which the freedom to engage in that activity is curtailed.  Beaumont, 539 U.S. at 161 (citation omitted).  Because the difference between a contribution limit and a ban is a difference in scope, not kind, closely

drawn scrutiny applies to both.   See Preston v. Leake, 660 F.3d 726, 734 (4th Cir. 2011)

("Although a ban ends association rights to a greater degree than does a limit by foreclosing the

ability to make even a small donation, this amounts to a difference in the scope of the particular

law, not a difference in the type of activity regulated by the law."); see also Green Party of

Connecticut v. Garfield, 616 F.3d 189, 199 (2d Cir. 2010) (applying closely drawn scrutiny to

ban on campaign contributions by state contractors and lobbyists).   As the Court in Beaumont

pointed out, "[T]he time to consider [the difference between a ban and a limit] is when applying

scrutiny at the level selected, not in selecting the standard of review itself."  539 U.S. at 162.

### 2.   *Government Interest*

Plaintiff's First Amendment challenge thus turns on whether § 441c is "closely drawn" to

serve a "sufficiently important" government interest.   To determine the governmental interest

involved, it is necessary to return to the middle of the last century.   The ban on political

contributions by federal contractors originated more than 70 years ago as part of the 1940

Amendments to the Hatch Act, codified originally at 18 U.S.C. § 61m-1 and later at 18 U.S.C. §

611.  See Hatch Act Reform Amendments of 1990, S. Rep. 101-165 at *18; 84 Cong. Rec. 9597-

9600; U.S. Civil Service Commission v. National Ass'n of Letter Carriers, 413 U.S. 548, 560

(1973).   In 1972, a slightly modified version of the ban was incorporated into the Federal

Election Campaign Act of 1971.  See Pub. L. 92-225, Title II, § 206, 86 Stat. 10 (Feb. 7, 1972).

Concerns about corruption arising from political contributions by federal contractors

played a role in the Hatch Act's passage in 1939, although the ban did not come into being until

the next year.   Congressman Robert Ramspeck, a supporter of the bill, warned other members of

the House that what "is going to destroy this Nation, if it is destroyed, is political corruption,

based upon traffic in jobs and in contracts, by political parties and factions in power."  84 Cong.

Rec. 9616 (1939) (statement of Rep. Ramspeck) (emphasis added).   Another Congressman reminded his colleagues of the "Democratic campaign book" scandal, in which federal contractors were effectively required to pay bribes in order to secure government business.  84 Cong. Rec. 9599 (1939) (statement of Rep. Taylor) (scheme that required federal contractors to buy campaign books at extremely inflated prices "was just a subterfuge to levy cold-blooded blackmail, and the victims knew it, but there was no alternative if they expected to continue to get Government business").

These concerns animated discussion about the amendments to the Hatch Act in 1940. Senator Brown, supporting a version of the contribution ban similar to the one ultimately passed, stated that the ban simply prevents those seeking government contracts from "attempt[ing] to influence the Government" by "pernicious political activity."   86 Cong. Rec. 2616 (1940) (statement of Sen. Brown).  It is thus clear that, in passing the ban, Congress wished to prevent corruption and the appearance thereof and, in so doing, to protect the integrity of the electoral system by ensuring that federal contracts were awarded based on merit.  Cf. Randall v. Sorrell, 548 U.S. 230, 232 (2006) ("[T]he interests served by contributions limits, preventing corruption and its appearance, 'directly implicate the integrity of our electoral process.'") (citing McConnell v. Federal Election Commission, 540 U.S. 93, 136 (2003)).

It is well established that preventing corruption or its appearance is a sufficiently important government interest to justify certain restrictions on political giving.  See Buckley, 424 U.S. at 29 (holding that the "weighty interests" – i.e. the prevention of corruption and the appearance of corruption – "served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling"); see also McConnell, 540 U.S. at 143 ("Our cases have made

clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits."), overruled in part on other grounds by Citizens United, 130 S. Ct. at 913.  In fact, preventing corruption or the appearance of corruption is the only interest the Supreme Court has recognized as "sufficiently important to outweigh the First Amendment interests implicated by contributions for political speech."  SpeechNow.org v. Federal Election Commission, 599 F.3d 686, 692 (D.C. Cir. 2010) (en banc).  There can thus be no doubt that preventing "pay-to-play" deals or pressure on contractors to give – or the appearance that either is occurring – is sufficiently important to warrant restrictions on political contributions by federal contractors.

### 3. *Closely Drawn*

The question before the Court, then, is whether a total ban on contributions by individual federal contractors is closely drawn to serve the government's anti-corruption interest. (Corporate contractors, it should be noted, may not give directly, but political action committees created by the corporation may do so.  See 2 U.S.C. §§ 441c(a)-(b).)  In considering this issue, the Court is mindful that closely drawn scrutiny is a "relatively complaisant [standard of] review under the First Amendment."  Beaumont, 539 U.S. at 161.  It was adopted in lieu of strict scrutiny because the Supreme Court determined that financial "contributions lie closer to the edges than to the core of political expression."  Id.  Accordingly, contribution limits – even those "involving 'significant interference' with associational rights" – are considered to be merely "'marginal' speech restrictions."  Id. at 161-62.  It is not surprising, therefore, that the Supreme Court has struck down only one political-contribution limit as too restrictive.  See Randall, 548 U.S. at 261 (Vermont's general limit on campaign contributions of $200 per candidate per election not closely drawn because it would "inhibit effective advocacy by those who seek

election, particularly challengers," "mute the voice of political parties," "hamper participation in campaigns through volunteer activities," and was "not indexed for inflation").

A restriction that is closely drawn must nevertheless "avoid unnecessary abridgement of associational freedoms," as "the right of association is a 'basic constitutional freedom' … that is 'closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.'"  Buckley, 424 U.S. at 25.  Because an outright ban on contributions "precludes 'the symbolic expression' that comes with a small contribution," it "causes considerably more constitutional damage" than a limit.  Green Party, 616 F.3d at 204.  Whether the provision at issue involves a ban or a limit is thus an important factor in the First Amendment analysis.  See id. at 204 (where a contribution limit, as opposed to a total ban, will adequately achieve the government's objectives, "it will be difficult for the government to establish that a contribution ban is 'closely drawn' to its asserted interests"); see also Beaumont, 539 U.S. at 162 (the time to consider the difference between a ban and a limit is when applying the appropriate level of scrutiny, not when choosing it).

The Court's duty here is to assess the proportionality of the ban to the government's asserted interests in order to ensure that First Amendment freedoms are not impermissibly burdened.  See Randall, 548 U.S. at 249, 262.  Cases in which other Circuits have considered First Amendment challenges to similar bans provide some guidance.  In Green Party, the Second Circuit evaluated whether Connecticut's ban on contractor and lobbyist campaign contributions was closely drawn to the state's anti-corruption interest.  Id., 616 F.3d at 204.  The court's analysis relied heavily on the fact that the ban was passed in response to corruption scandals in which public officials, including the former governor, had accepted gifts from contractors and prospective contractors in exchange for helping them secure lucrative state contracts.  Id. at 193-

94, 202, 205.  It indicated that if the ban had been solely for the purpose of combating "<u>actual</u> corruption," it "would likely be held overbroad," as a limit would have sufficed.  <u>Id.</u> at 205 (emphasis in original).  In light of the state's interest in combatting the <u>appearance</u> of corruption, however, any political contribution by contractors (after the scandals) might create a perception that they were "exert[ing] improper influence on state officials."   <u>Id.</u>   The court held, accordingly, that the ban on contributions by state contractors, while "a drastic measure," was consistent with the First Amendment.  <u>Id.</u> at 204.  By contrast, it decided that the same ban was not closely drawn as it applied to lobbyists because they had played no part in the corruption scandals that animated Connecticut's legislation.  <u>Id.</u> at 205, 207.

This same factor is at play here.  When Congress first enacted the ban on political contributions by federal contractors, it was responding to a recent history of corruption.  As just discussed, the ban was originally passed in 1940 on the heels of the "campaign-book racket," in which those seeking government contracts were effectively required to buy copies of the Democratic campaign book at highly inflated prices in order to secure government business.  84 Cong. Rec. 9598-99 (1939).  In the wake of this scandal, it was eminently reasonable for the legislature to ban contributions by federal contractors.  Doing so would not only insulate prospective contractors from pressure to give money to politicians, but it would also help ensure a merit-based system of awarding contracts and "reassure[] citizens that its politicians are acting on their behalf and not on behalf of the highest bidder."  <u>Preston</u>, 660 F.3d at 741.  Because, just as in <u>Green Party</u>, Congress reacted to recent scandals in imposing the ban on contractor contributions, its restrictions are more easily characterized as closely drawn.

Plaintiffs argue that there is no <u>current</u> evidence that individual federal contractors may corrupt the election process or be pressured to give.  An absence of corruption does not

necessarily mean, however, that the ban is no longer needed.  It could simply be an indication that the ban is working.  See Burson v. Freeman, 504 U.S. 191, 208 (1992) (noting difficulty of finding evidence to support long-enforced statutes).  Nor is it possible to say that the role of money in federal campaigns has diminished; indeed, the converse is incontrovertibly true.  See Wisconsin Right to Life, 551 U.S. at 507 ("If the threat … flowing from concentrations of money in politics has reached an unprecedented enormity, it has been gathering force for generations.").

As a result, the suggestion that those seeking federal contracts might "pay to play" is hardly novel or implausible.  See Shrink Missouri, 528 U.S. at 391 ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny … will vary up or down with the novelty and plausibility of the justification raised.").  It in no way stretches the imagination to envision that individuals might make campaign contributions to curry political favor.  Examples of such behavior abound, as Connecticut's recent corruption scandals demonstrate.  See, e.g., Green Party, 616 F.3d 189, 193 (discussing corruption scandals in Connecticut that preceded ban); see also Ognibene v. Parkes, 671 F.3d 174, 188-89 (2d Cir. 2012) (imposition of lower contribution limits on those who do business with New York City "responded to actual pay-to-play scandals in [the city] in the 1980s"); Blount v. SEC, 61 F.3d 938, 944-45 (D.C. Cir. 1995) (specific evidence of *quid pro quo* corruption unnecessary because "underwriters' campaign contributions self-evidently create a conflict of interest in state and local officials who have power over municipal securities contracts and a risk that they will award the contracts on the basis of benefit to their campaign chests rather than to the governmental entity"; "risk of corruption is obvious and substantial").  The threat of corruption addressed by the provision at issue here is thus far

from "illusory," see Ognibene, 671 F.3d at 183, but instead provides a reasonable basis for restricting political contributions by federal contractors.

In addition to Green Party, a recent case arising in North Carolina also dealt with the issue of contribution bans.  In Preston v. Leake, the Fourth Circuit upheld a ban on campaign contributions, albeit for somewhat different reasons than the Second Circuit's decision in Green Party.  Preston involved a North Carolina statute that prohibited lobbyists from contributing to the campaign of any candidate for the North Carolina General Assembly or Counsel of the State. Id., 660 F.3d at 729.  Lobbyist Sarah Preston, wishing to make a contribution "of not more than $25 to express her support for legislative candidates of her choice," id. at 731, filed suit, alleging that the ban violated the First Amendment.   Preston maintained that a total ban was unconstitutional on its face because the state could have allowed for small donations "without undermining its interest in preventing actual and perceived corruption."  Id. at 736.  The Court rejected this argument, highlighting as its principal considerations deference to the legislature and the alternative means of political expression that remained available to lobbyists.

As to the first, in holding that North Carolina's ban withstands First Amendment scrutiny, the Fourth Circuit emphasized that it is for the legislature – not the courts – to determine how to appropriately address corruption.  Noting the history of scandal that preceded the statute, the Court stated that the provision being challenged "was a valid exercise of North Carolina's legislative prerogative to address potential corruption and the appearance of corruption in the state."  Id. at 729.  The court deferred to the legislature's judgment that "a complete ban was necessary as a prophylactic," remarking that "'[c]ourts simply are not in the position to second-guess' [legitimate legislative judgments], especially 'where corruption is the evil feared.'"  Id. at 736.

The Court also indicated that North Carolina's ban imposed an acceptable burden on First Amendment freedoms because state lobbyists had numerous other avenues for expressing their support for political candidates.  Though the challenged North Carolina provision prohibited any and all contributions by lobbyists – no matter how small – the Court reasoned that it was "less onerous because of the numerous other ways in which would-be contributors can associate with particular candidates and express their political viewpoints."  Id. at 734; see also Shrink Missouri, 528 U.S. at 386-89.  It described restrictions on contributions – when limited to a particular group – as mere "channeling device[s], cutting off the avenue of association and expression that is most likely to lead to corruption but allowing numerous other avenues of association and expression."  Preston, 660 F.3d at 734.  Tying the availability of alternative ways of engaging in political speech and association to judicial deference, the court stated that, "so long as Preston and other lobbyists have other means of showing their symbolic support for a candidate," it must defer to the legislature's judgment.  Id. at 740.

These considerations – deference to Congress and contractors' freedom to express political support and association in other ways – likewise weigh against Plaintiffs' success on the merits here.  "The judiciary owes special deference to legislative determinations regarding campaign contribution restrictions," Ognibene, 671 F.3d at 182 (citing Beaumont, 539 U.S. at 155; McConnell, 540 U.S. at 137), as the legislature has "particular expertise" in these matters and "is better equipped to make … empirical judgments" about what contribution restrictions are appropriate.  Randall, 548 U.S. at 248; see also Beaumont, 539 U.S. at 155 ("[D]eference to legislative choice is warranted particularly when Congress regulates campaign contributions, carrying as they do a plain threat to political integrity….").  While there exists "some lower bound" on contribution limits – i.e., when the "constitutional risks to the electoral process

become too great" – Congress has not ventured into that territory here.  Randall, 548 U.S. at 248-49 (stating that contribution restrictions of $200 per candidate on all members of the public may be too severe when they "harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability" (emphasis added)).

There is even less need for the Court to interfere with legislative judgments where the persons affected by the ban have other meaningful avenues for political association and expression.  See Blount, 61 F.3d at 948 (contribution ban closely drawn where municipal finance professionals not in any way restricted from engaging in vast majority of political activities); Preston, 660 F.3d at 740 (noting that lobbyists subject to contribution ban had numerous alternative means of engaging in First Amendment activities).   Here, individual federal contractors are free to express their views – orally or in writing – on candidates and political issues, volunteer for campaigns, and offer the use of their homes for candidate-related or political-party-related activities. 2 U.S.C. § 431(8)(B); 11 C.F.R. §§ 100.74-100.77.  Indeed, the types of political speech available to federal contractors are often more expressive than the act of making a financial contribution.  See Buckley, 424 U.S. at 21 ("A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support.").  It should be noted, furthermore, that Plaintiffs voluntarily chose to become federal contractors and are only subject to the ban for as long as they continue to make that choice.  See Preston, 660 F.3d at 740 ("Preston freely chose to become a registered lobbyist, and in doing so agreed to abide by a high level of regulatory and ethical requirements focusing on the relationship of lobbyist and public official.").

Plaintiffs nevertheless argue that the ban is not closely drawn because "there is no nexus between the persons or entities to whom contributions might be made – candidates for President/Vice President and Members of Congress, political parties, and political committees – and the persons making decisions on government contracts." Mot. at 29-30. As the vast majority of federal contracts are awarded at the agency level, Plaintiffs contend that elected federal officials play no role in determining who gets the government's business. Id. (citing 48 C.F.R. § 1.601(a)). This wall between elected federal officials and agency heads is hardly as impassable as Plaintiffs make out. Plaintiffs themselves acknowledge that the President or members of Congress may be involved in the procurement process for large or important contracts. See Mot. at 30. In addition, Defendants point out, and Plaintiffs do not dispute, that elected officials can and sometimes do recommend contractors to agencies. In fact, most agency officials are themselves political appointees who owe their jobs to the Administration. See Opp. at 17-18; Reply at 12. In light of this, there is a connection between federal elected officeholders and the awarding of contracts, albeit indirect, that supports a finding that the ban is closely drawn.

Finally, Plaintiffs make a number of "underinclusiveness" arguments, which are very unlikely to succeed. See Mot. at 36-37. They contend, for example, that people seeking grants from the federal government or admission to one of the tuition-free military academies should be included under the ban. The D.C. Circuit has squarely rejected arguments of this kind, stating that "a regulation is not fatally underinclusive simply because an alternative regulation, which would restrict more speech or the speech of more people, could be more effective. The First Amendment does not require the government to curtail as much speech as may conceivably serve its goals." Blount, 61 F.3d at 946 (emphasis in original).

The Court thus concludes that Plaintiffs have not demonstrated a likelihood of success on the merits with respect to their First Amendment claim.

## IV.   Equal Protection

Plaintiffs also contend that § 441c of FECA violates the equal-protection guarantee of the Fifth Amendment by banning political contributions by federal contractors but not by similarly situated individuals.  See News Am. Publ'g, Inc. v. FCC, 844 F.2d 800, 804 (D.C. Cir. 1988) ("Although the Equal Protection Clause appears only in the 14th Amendment, which applies only to the states, the Supreme Court has found its essential mandate inherent in the Due Process Clause of the Fifth Amendment and therefore applicable to the federal government.") (citing Bolling v. Sharpe, 347 U.S. 497 (1954)).  They point to two broad groups who they allege are similarly situated but are not barred from making contributions in connection with federal elections: (1) employees of federal agencies, many of whom work alongside federal contractors; and (2)(a) officers, directors, employees, and stockholders of contracting corporations, (b) political committees established by contracting corporations, and (c) individuals who establish a single-person corporation and contract with the government through that entity.  See Mot. at 2.

### 1.   *Standard of Review*

The battle over the equal-protection claim in this case, both sides realize, is fought and won largely on the appropriate level of scrutiny.  Plaintiffs maintain that strict scrutiny applies because the ban "impinges upon a fundamental right explicitly or implicitly protected by the constitution."  Mot. at 16 (quoting San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 17 (1973)).  Defendant responds that § 441c "concerns no fundamental rights" and, accordingly, is subject only to rational-basis review.  Opp. at 27-31.

The Supreme Court has stated in no uncertain terms that political contributions implicate the First Amendment freedom of association, which is a "basic constitutional freedom" that, "like free speech, lies at the foundation of a free society." Buckley, 424 U.S. at 25 (quoting Kusper v. Pontikes, 414 U.S. 51, 57 (1973), and Shelton v. Tucker, 364 U.S. 479, 486 (1960)) (internal quotation marks omitted); see also McConnell, 540 U.S. at 231 ("Limitations on the amount that an individual may contribute to a candidate or political committee impinge on the protected freedoms of expression and association.") overruled in part on other grounds by Citizens United, 130 S. Ct. at 913. Campaign contributions, however, "lie closer to the edges than to the core of political expression," Beaumont, 539 U.S. at 161, and Defendant argues on this basis that limits or bans on contributions do not implicate fundamental rights. See Opp. at 30. The Supreme Court has yet to decide what level of scrutiny applies to equal-protection challenges to laws restricting political contributions.

If strict scrutiny were to apply to equal-protection claims in the area of campaign contributions, it would lead to the anomalous result that a statutory provision could survive closely drawn scrutiny under the First Amendment, but nevertheless be found to violate equal-protection guarantees because of its impingement upon the very same rights. Any First Amendment claim that could be reframed as an equal-protection challenge would thus be entitled to strict scrutiny and would consequently stand a much greater chance of prevailing. This is particularly concerning given that the Supreme Court has explicitly rejected strict scrutiny for contribution limits (and bans) being challenged in the First Amendment context. See Beaumont, 539 U.S. at 161 (holding that closely drawn scrutiny, not strict scrutiny, applies to bans on political contributions); see also Renton v. Playtime Theatres, Inc., 475 U.S. 41, 55 n.4 (1986) ("[R]espondents can fare no better under the Equal Protection Clause than under the First

Amendment itself."); McConnell v. Federal Election Commission, 251 F. Supp. 2d 176, 709 n.180 ("'It is generally unnecessary to analyze laws which burden the exercise of First Amendment rights under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights.… If the Court … finds that the classification does not violate any First Amendment right, the Court is unlikely to invalidate that classification under equal protection principles.'") (quoting Ronald D. Rotunda and John E. Nowak, Treatise on Constitutional Law – Substance & Procedure § 18.40 (3d ed. 1999)), aff'd in part and rev'd in part, 540 U.S. 93 (2003).

On the other hand, Defendant does not present a strong argument in favor of applying rational-basis review here. It relies primarily on a footnote in Blount, 61 F.3d 938, a D.C. Circuit case upholding (against a First Amendment challenge) a restriction on campaign contributions by municipal securities professionals to the state officials from whom they obtain business. The D.C. Circuit indicated that the Petitioner "toss[ed] into his opening brief a footnote" contending that the regulation at issue violated not only the First Amendment but also the due process clause of the Fifth Amendment. Id. at 946 n.4. While declining to evaluate the Petitioner's due-process claim, the Circuit stated that "the Fifth Amendment requires only that the government have a rational basis for its distinction." Since the equal-protection guarantee of the Fourteenth Amendment is incorporated into the Fifth Amendment under the due process clause, Bolling, 347 U.S. at 498-99, this would at first glance suggest, if in somewhat attenuated fashion, that rational-basis review is appropriate here.

Upon further review, however, that is not the case. Blount cites Vance v. Bradley, 440 U.S. 93 (1979), for the proposition that rational-basis review applies to disparate-treatment claims under the due process clause. The plaintiffs in Vance alleged that they were denied equal

protection of the laws because they were (or would be) forced to retire from the Foreign Service at age 60 while Civil Service employees would not.  Id. at 94-95.  In selecting the level of review, the court explicitly stated that the Appellees did not "suggest that the statutory distinction between Foreign Service personnel over age 60 and other federal employees over that age burdens a suspect group or a fundamental interest." Id. at 96-97.  The court concluded that, in the absence of these considerations, rational-basis review applied.  Such a determination is hardly an endorsement for applying this type of review here since Plaintiffs do contend that the challenged provision improperly burdens their fundamental right to associate. The D.C. Circuit's generic statement in a campaign-finance case that rational-basis review applies to Fifth Amendment due-process claims is thus less persuasive than it might first appear.

As neither strict scrutiny nor rational-basis review seems applicable here, the Court can only conclude that some form of intermediate scrutiny is appropriate.  See U.S. v. Virginia, 116 S. Ct. 2264, 2292 (1996) ("We have no established criterion for 'intermediate scrutiny' either, but essentially apply it when it seems like a good idea to load the dice.  So far it has been applied to content-neutral restrictions that place an incidental burden on speech, to disabilities attendant to illegitimacy, and to discrimination on the basis of sex.").  Intermediate scrutiny has previously been applied in the equal-protection context.  See Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 219 (2000) ("[s]o-called intermediate scrutiny" has been approved in equal-protection cases involving "classifications on a basis other than race"); Mississippi University for Women v. Hogan, 458 U.S. 718, 724 (1982) (under Equal Protection Clause, discrimination on basis of gender is only constitutional if it is "substantially related" to "important governmental objectives"); Mills v. Habluetzel, 456 U.S. 91, 98 (1982) (disparate treatment of illegitimate children survives equal-protection scrutiny only if "substantially related to a legitimate state

interest"). Rather than adopting the standards that have been applied to protected classifications other than race, however, it makes more sense to apply closely drawn scrutiny; that, after all, is the form of intermediate scrutiny the Supreme Court has specifically designated for restrictions on financial contributions to campaigns and political organizations. Beaumont, 539 U.S. at 161. Such a form of review also cures the problem of permitting Plaintiffs to obtain a different level of scrutiny from their First Amendment challenge merely by labeling their claim one of equal protection.

There is precedent for importing scrutiny levels from First Amendment cases when an equal-protection challenge implicates First Amendment rights. Police Department of the City of Chicago v. Mosley, 408 U.S. 92 (1972), involved an "equal protection claim [that was] closely intertwined with First Amendment interests." Id. at 95. In that case, the Supreme Court considered a law that "exempt[ed] peaceful labor picketing from its general prohibition on pikceting [sic] next to a school." Id. at 94. Applying the First Amendment standard from United States v. O'Brien, 391 U.S. 367 (1968), the Court concluded that the ordinance "impose[d] a selective restriction on expressive conduct far 'greater than is essential to the furtherance of (a substantial governmental) interest.'" Mosley, 408 U.S. at 102. On this basis, it held that "under the Equal Protection Clause, [the ordinance] may not stand." Id.; see also Williams v. Rhodes, 393 U.S. 23, 30-31 (1968) ("[F]reedom protected against federal encroachment by the First Amendment is entitled under the [Equal Protection Clause of the] Fourteenth Amendment to the same protection from infringement by the States.") (emphasis added).

The Court concludes, therefore, that to survive an equal-protection challenge, § 441c's ban on contributions by federal contractors must be "closely drawn to match a sufficiently important interest." Beaumont, 539 U.S. at 161. To the extent that individual federal contractors

are treated differently from similarly situated persons or entities, the Court must determine, "[a]s in all equal protection cases," whether "an appropriate governmental interest [is] suitably furthered by the differential treatment." Mosley, 408 U.S. at 95.  As part of this inquiry, the Court is required to "consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." Williams, 393 U.S. at 30.

2. *Federal Employees*

The Court will begin its analysis by assessing – with respect to each alleged comparison group – whether they are similarly situated to individual federal contractors, and if so, whether they are being treated differently to their disadvantage.  Plaintiffs first allege that § 441c violates equal protection because federal employees are permitted to donate money in connection with federal elections, while federal contractors, who often work alongside them and perform similar tasks, are not.  Mot. at 7-8, 20-22.  Although it may be true that the duties of federal contractors and employees increasingly overlap, see Memorandum [from President Obama] for the Heads of Executive Departments and Agencies, available at http://www.whitehouse.gov/the_press_office/Memorandum-for-the-Heads-of-Executive-Departments-and-Agencies-Subject-Government (last visited April 13, 2012) (line between inherently governmental functions performed by government employees and private-sector contractor functions has been "blurred"), the question is whether there is nevertheless a difference between the two groups in relation to the government's "sufficiently important interest" in preventing corruption that justifies disparate treatment.  See Beaumont, 539 U.S. at 161.

As already discussed, Congress – in the aftermath of scandals involving federal contractors – passed the ban seeking to prevent corruption and its appearance, and to insulate contractors from pressure to make political contributions in order to obtain or retain government business.  See Section III.A., *supra*.  At that time, Congress determined that contractors and employees were not similarly situated with respect to their history of corruption such that a ban on employee contributions was necessary.  See 18 U.S.C. § 603(a) (federal employees only prohibited from making political contributions to their employer or employing authority); see also Green Party, 616 F.3d at 206, 212 (holding that because lobbyists and contractors did not share the same history of corruption, Connecticut's total ban on political contributions was closely drawn with respect to contractors but not lobbyists).

A government contract, moreover, can be worth far more than an employment position with the federal government, and specific protections in place to ensure that federal employment is awarded based on merit do not exist for federal contractors.  See, e.g., 5 U.S.C. §§ 1201-06; 2301(b)(2), (b)(8)(A) (laws enforced by Merit Systems Protection Board prohibit differential treatment of federal employees based on their political affiliation and protect them from "coercion for partisan political purposes").  As such, § 441c's ban reflects a reasonable legislative judgment that contracting is particularly susceptible to *quid pro quo* arrangements or the appearance thereof.  The Court finds, therefore, that federal contractors are not similarly situated to federal employees with respect to the anti-corruption interest at which the statute is aimed.  See Reed v. Reed, 404 U.S. 71, 76 (1971) (to withstand equal-protection challenge, even under rational-basis review, statutory classification "'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation….'" (citation omitted)).

Even if the two groups were similarly situated in relation to potential corruption, §441c's restriction on contributions by federal contractors does not necessarily burden their First Amendment freedoms to a greater extent than limitations imposed exclusively on federal employees.  For instance, while federal contractors are permitted to solicit campaign donations and invite people to political fundraisers, federal employees are not.  See 5 C.F.R. § 734.303; 2 U.S.C. § 431(8)(B); 11 C.F.R. §§ 100.74-100.77.  The restrictions on federal contractors' freedoms of expression and association are different from those on federal employees, but not necessarily more severe.   As variations between federal contracting and employment "'may require different forms of regulation in order to protect the integrity of the electoral process,'" the Court will defer to Congress's judgment in this area.  Federal Election Commission v. National Right to Work Committee, 459 U.S. 197, 210 (1982) (citation omitted); see also McConnell, 540 U.S. at 188 ("Congress is fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation.") (citing National Right to Work Committee, 459 U.S. at 210);  Arizona Free Enterprise Club, 131 S. Ct. at 2842 n.11 (courts' practice is not to "'second-guess a … [legislative] determination as to the need for prophylactic measures where corruption is the evil feared'" (quoting National Right to Work Committee, 459 U.S. at 210)).

### 3.  *Corporate Contractors*

Plaintiffs also allege that the officers, directors, employees, and stockholders of contracting corporations, as well as the political action committees established by those corporations, are similarly situated to individual federal contractors, but are treated differently inasmuch as they are permitted to make political contributions.  See Mot. at 2.  While contracting corporations themselves are subject to the very same ban as individual federal contractors, those

who own and manage the corporation are free to contribute to federal elections.  This distinction is closely drawn because, in contributing to political candidates or organizations, these individuals act in their personal capacity – not as agents of the corporation and not as the actual contracting parties.  Their contributions thus in no way express the views or associations of the corporation.  The same is true of political action committees established by the corporation.  See Citizens United, 130 S. Ct. at 897 (because a "PAC is a separate association from the corporation," its expenditures "do[] not allow corporations to speak").  Individual federal contractors, accordingly, are not similarly situated to PACs or officers of contracting corporations; as a result, their disparate treatment does not present an equal-protection problem.

Finally, Plaintiffs complain that the ban on contributions by individual federal contractors violates equal protection because "individuals who establish a single-person corporation and contract with the government through that entity" are permitted to make financial contributions in connection with federal elections.  See Mot. at 2.  This argument, although somewhat more compelling, fails for the same reason Plaintiff's equal-protection argument about officers, directors, and shareholders of corporations is deficient.  Even as the sole officer, director, and shareholder of a corporation, an individual retains an identity separate from the corporation.  See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163 (2001) ("[T]he employee and the corporation are different 'persons,' even where the employee is the corporation's sole owner.  After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." (citing United States v. Bestfoods, 524 U.S. 51, 61-62 (1998)).  An individual owner of a corporation that has a government contract thus has a different legal identity – and, correspondingly, different rights and obligations – from someone

who has contracted, himself or herself, with the government.  In light of this, they are not similarly situated for purposes of this equal-protection analysis.

Because the various comparison groups suggested by Plaintiffs are not similarly situated to individual contractors subject to § 441c, their equal-protection claim does not have a likelihood of success on the merits.  Since Plaintiffs have likewise failed to satisfy this prong with respect to their First Amendment challenge, the Court will deny the preliminary injunction without analyzing the other three factors.  See Chaplaincy, 454 F.3d at 304 (failure to show likelihood of success on merits is sufficient to deny preliminary injunction).

### V.     Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order denying Plaintiffs' Motion for a Preliminary Injunction.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  April 16, 2012