## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
                                              )
WENDY E. WAGNER, *et al.*,                    )
                                              )
                  Plaintiffs,                 )
                                              )        Civil Action No. 11-cv-1841-JEB
         v.                                   )
                                              )        MEMORANDUM
FEDERAL ELECTION COMMISSION,                  )
                                              )
                  Defendant.                  )
———————————————————————— )


## DEFENDANT FEDERAL ELECTION COMMISSION'S
## MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
## AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Anthony Herman (D.C. Bar No. 424643)
General Counsel

David Kolker (D.C. Bar No. 394558)
Associate General Counsel

Lisa J. Stevenson (D.C. Bar No. 457628)
Special Counsel to the General Counsel

Harry J. Summers
Assistant General Counsel

Holly J. Baker
Attorney

Seth Nesin
Attorney

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street, NW
Washington, DC 20463
Telephone: (202) 694-1650
Fax: (202) 219-0260

August 15, 2012

## TABLE OF CONTENTS

**Page**

BACKGROUND ..................................................................................................1

ARGUMENT ......................................................................................................3

I.   SECTION 441c IS CONSTITUTIONAL UNDER THE  FIRST
     AMENDMENT.............................................................................................3

     A.   The Federal Contractor Ban Is Closely Drawn to Match
          the Government's Important Interests in Preventing
          Corruption, the Appearance of Corruption, and Political
          Coercion of Federal Contractors............................................................3

     B.   Section 441c Serves an Important Purpose in Combating
          Corruption ............................................................................................7

     C.   Section 441c Is Closely Drawn Because It Creates Only
          a Modest Burden on Expression  .........................................................10

     D.   Section 441c's Constitutionality Is Not Called into Question
          by Either Its Legislative History or Congress's Decision Not
          to Amend the Provision ......................................................................12

II.  SECTION 441c SATISFIES THE EQUAL PROTECTION
     GUARANTEE OF THE FIFTH AMENDMENT ...........................................13

     A.   Because the Contribution Ban Does Not Infringe a
          Fundamental Right, It Receives a More Lenient Standard
          of Review ...........................................................................................13

     B.   Equal Protection Analysis Must Consider the Statute as
          a Whole to Determine Whether Differential Treatment Is
          Constitutional .....................................................................................15

     C.   The Differential Treatment Between Federal Contractors
          and Federal Employees Is Constitutional .............................................17

D.     The Differential Treatment Between Individual Contractors
       and Corporate Contractors Is Constitutional.........................................19

III.    CONCLUSION................................................................................................21

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adarand Constructors, Inc. v. Slater*, 528 U.S. 216 (2000) .........................................14

*Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995) ...........................................................6, 11

*\*Buckley v. Valeo*, 424 U.S. 1 (1976)..................................................................*passim*

*Burson v. Freeman*, 504 U.S. 191 (1992) .......................................................................7

*\*Cal. Med. Ass'n v. FEC*, 453 U.S. 182 (1981)..................................................... 15-16

*Citizens United v. FEC*, 130 S. Ct. 876 (2010)............................................................20

*\*FEC v. Beaumont*, 539 U.S. 146 (2003) .........................................................3, 14, 20

*Green Party of Conn. v. Garfield*, 616 F.3d 189 (2d Cir. 2010),
    *cert denied*, 131 S. Ct. 3090 (2011) ...................................................................7

*Lavin v. Husted*, No. 11-3908, 2012 WL 3140909 (6th Cir. Aug. 3, 2012) ..................7

*McConnell v. FEC*, 540 U.S. 93 (2003)....................................................................6, 8

*Mills v. Habluetzel*, 456 U.S. 91 (1982) .....................................................................14

*Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982) ...............................................14

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012)....................................12

*Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377 (2000) .................................3, 6, 10

*Police Dept. of City of Chi. v. Mosley*, 408 U.S. 92 (1972)..........................................15

*Preston v. Leake*, 660 F.3d 726 (4th Cir. 2011) ..........................................................11

*Randall v. Sorrell*, 548 U.S. 230 (2006) .................................................................5, 18

*\*U.S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*
    413 U.S. 548 (1973) ........................................................................3, 4, 11

*United States v. Fausto*, 484 U.S. 439 (1988) ............................................................13

*Williams v. Rhodes*, 393 U.S. 23 (1968) ...................................................................15

*Woods v. Cloyd W. Miller Co.*, 333 U.S. 138 (1948)...................................................12

*Yamada v. Weaver*, No. 10-cv-00497, 2012 WL 983559
     (D. Hawaii March 21, 2012) ...........................................................................7

**Statutes and Regulations**

Amendments to Hatch Act of 1939, 1940 Ed., § 61m-1 (July 19, 1940, c. 640,
     § 5, 54 Stat. 772), codified at 18 U.S.C. § 611 ..............................................2

Federal Election Campaign Act of 1971, as amended, 2 U.S.C. §§ 431-57 ..................1

2 U.S.C. § 431(8)(B) .................................................................................................11

2 U.S.C. § 441b(a) ...................................................................................................19

2 U.S.C. § 441b(b) ...................................................................................................15

2 U.S.C. § 441b(b)(4)(A)(i) ......................................................................................19

*2 U.S.C. § 441c ...............................................................................................*passim*

2 U.S.C. § 441c(a).....................................................................................................1

2 U.S.C. § 441c(a)(1) ...............................................................................................1

2 U.S.C. § 441c(b) ...................................................................................................19

5 U.S.C. §§ 1201-1209 .............................................................................................18

5 U.S.C. §§ 1214-15 .................................................................................................18

5 U.S.C. §§ 2301(b)(1) .............................................................................................18

5 U.S.C. §§ 2301(b)(2) .............................................................................................18

5 U.S.C. §§ 2301(b)(8)(A).........................................................................................18

5 C.F.R. § 734.413 ...................................................................................................17

11 C.F.R. §§ 100.74-100.77........................................................................................11

11 C.F.R. § 100.94......................................................................................................11

**Miscellaneous**

86 Cong. Rec. 2563 (March 8, 1940)..........................................................................12

Md. State Dep't of Assessments and Taxation, Articles of Organization for LLC
    form and instructions, http://www.dat.state.md.us/sdatweb/artorgan.pdf ........21

U.S. Senate, Committee on Homeland Security and Government Affairs,
    S. Prt. 110-36, Policy and Supporting Positions (2008) ....................................8

In denying plaintiffs' request for a preliminary injunction, this Court previously held that it is unlikely that 2 U.S.C. § 441c violates either the First Amendment or the equal protection guarantee of the Fifth Amendment as applied to individuals with federal contracts. *Wagner v. FEC*, __F. Supp.2d __, 2012 WL 1255145 (D.D.C. Apr. 16, 2012) ("Mem. Op.") (Doc. No. 28). As the Court recognized, the prohibition on federal contractors making campaign contributions is a longstanding and important measure in combating corruption and the appearance of corruption, and ensuring an effective and unbiased federal workforce free from political coercion. Neither plaintiffs' memorandum in support of their motion for summary judgment (Plaintiffs' Statement of Points and Authorities in Support of Their Motion for Summary Judgment ("Pls.' Mem.") (July 12, 2012) (Doc. No. 30-1)) nor their statement of undisputed facts offers anything new that could support a different conclusion on the merits. The Court should therefore uphold the statute and grant summary judgment for the Federal Election Commission ("FEC" or "Commission").[1]

## BACKGROUND

The Federal Election Campaign Act of 1971, as amended ("FECA" or "Act"), 2 U.S.C. §§ 431-57, prohibits any person who is negotiating or performing a contract with the United States government or any of its agencies or departments from making a contribution to any political party, political committee, or federal candidate. *See* 2 U.S.C. § 441c(a).[2] Congress

---

[1]     To diminish duplication of earlier briefs, the parties agreed that they would each file only a single brief on their cross motions for summary judgment and that arguments made in the earlier briefs would not be waived by failure to raise them here. A more complete recitation of the background is set forth in the FEC's prior brief filed in opposition to plaintiffs' motion for a preliminary injunction. (Defendant FEC's Opposition To Plaintiffs' Motion for a Preliminary Injunction (Mar. 1, 2012) (Doc. No. 25).)

[2]     2 U.S.C. § 441c(a)(1) provides:

"(a) *Prohibition.* It shall be unlawful for any person —

     (1) Who enters into any contract with the United States or any department or agency thereof either for the rendition of personal services or furnishing any material, supplies, or

originally enacted this prohibition on contributions by federal contractors as part of the 1940
amendments to the Hatch Act of 1939.[3]  The law was intended, *inter alia*, to ensure a merit-
based federal workforce free of coercion or other improper political influence, following many
decades of inadequate reform efforts to deal with the problems of political influence.  (FEC's
Statement of Material Facts ¶¶ 15-31 ("FEC Facts").)

Plaintiffs are three individuals who chose to enter into contracts with the federal
government and are thereby currently prohibited from making contributions.  (FEC Facts ¶¶ 2-5.)
They have brought this action to strike down the contribution prohibition in section 441c,
claiming that it violates both the First Amendment and the equal protection guarantee of the Fifth
Amendment.  The action was brought against the FEC, the independent agency of the United
States government with exclusive jurisdiction to administer, interpret, and civilly enforce FECA.
(*Id.* ¶ 1)

Plaintiffs sought a preliminary injunction barring the FEC from enforcing section 441c
while the case was pending, allegedly so that they could make contributions during the 2012
election cycle.  (Plaintiffs' Motion for a Preliminary Injunction) (Jan. 31, 2012) (Doc. No. 18).)
After full briefing and argument, the Court denied the motion for a preliminary injunction,
finding that plaintiffs were unlikely to succeed on the merits of their claims.  (Mem. Op. at 26.)

---

equipment to the United States or any department or agency thereof . . . , if payment for
the performance of such contract or payment for such material, supplies, equipment . . .
to be made in whole or in part from funds appropriated by the Congress, at any time
between the commencement of negotiations for the later of (A) the completion of
performance under; or (B) the termination of negotiations for, such contract or
furnishing of material, supplies, equipment . . . , directly or indirectly to make any
contribution of money or other things of value, or to promise expressly or impliedly to
make any such contribution to any political party, committee, or candidate for public
office or to any person for any political purpose or use[.]"

[3]    Amendments to Hatch Act of 1939, 1940 Ed., § 61m-1 (July 19, 1940, c. 640, § 5, 54
Stat. 772), codified at 18 U.S.C. § 611 (originally 18 U.S.C. § 61m-1).

**ARGUMENT**

I.     **SECTION 441c IS CONSTITUTIONAL UNDER THE FIRST AMENDMENT**

    A.     **The Federal Contractor Ban Is Closely Drawn to Match the Government's Important Interests in Preventing Corruption, the Appearance of Corruption, and Political Coercion of Federal Contractors**

A law limiting campaign contributions challenged under the First Amendment need not satisfy the "narrowly tailored" requirement of strict scrutiny.  Rather — as this Court previously determined, and plaintiffs acknowledged — such a law "passes muster if it satisfies the lesser demand of being closely drawn to match a sufficiently important interest." *FEC v. Beaumont*, 539 U.S. 146, 162 (2003) (quoting *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 387-88 (2000)) (internal quotation marks omitted); Mem. Op. 5-7; Plaintiffs' Reply Statement of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction at 12-13 (Mar. 12, 2012) (Doc. No. 26).

The Supreme Court has described the "closely drawn" standard as a "relatively complaisant review," *Beaumont*, 539 U.S. 161-62, and section 441c easily meets it.  The ban on contractor contributions closely matches the important government interests of preventing corruption and the "appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office. " *Buckley v. Valeo*, 424 U.S. 1, 25 (1976).  It also matches the interests of ensuring that federal contracts are awarded on merit, that federal contractors carry out their duties in a nonpartisan manner, and that contractors not be coerced into political participation.  The Supreme Court has identified these interests as sufficiently important to support some infringement on political expression.  *See U.S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 557, 565-66 (1973) (identifying the same substantial government interests supporting

the Hatch Act, which restricts political activity by federal employees).  Both this Court and

plaintiffs have also noted that these interests are substantial.  (Mem. Op. at 8-9 ("It is well

established that preventing corruption or its appearance is a sufficiently important government

interest to justify certain restrictions on political giving."); Pls.' Mem. at 7 (avoiding the

appearance of pay-to-play is "an important government interest.").)

Plaintiffs rely on three general arguments in their failed attempt to show that section 441c

is not "closely drawn."  First, plaintiffs argue that the problems of corruption and coercion could

be managed effectively through less-restrictive criminal statutes, such as the existing provisions

that criminalize the coercion of federal employees (*see* Pls.' Mem. at 6).  But plaintiffs fail to

acknowledge that the Hatch Act protects federal employees above and beyond the criminal

provisions they cite, and *Letter Carriers* clearly upheld Congress's decision to enact these

additional protections.  And regarding FECA, the Supreme Court in *Buckley* dismissed virtually

the same argument that plaintiffs make here.  The Court rejected the suggestion that FECA's

contribution limits were unconstitutional because the government's interest in preventing

corruption was adequately addressed by bribery and disclosure laws.  *Buckley*, 424 U.S. at 27.

The Court recognized that "laws making criminal the giving and taking of bribes deal with only

the most blatant and specific attempts of those with money to influence governmental action."

*Id.* at 27-28.  The Court thus held that it was well within Congress's power to determine that the

federal contractor contribution ban is necessary to prevent less blatant forms of corruption and

coercion.[4]

---

[4]      Plaintiffs note (Pls.' Mem. at 2) that the Court "may not be fully aware of the breadth of
application of section 441c, beyond plaintiffs themselves."  Neither plaintiffs nor the
Commission has been able to ascertain the precise number of individuals with federal
government contracts.  But the fact that this case has far-reaching implications is a reason for the
Court to proceed with extreme caution, not to overturn the law.  And the fact that some

Second, plaintiffs invent a series of other statutory provisions that they believe would be less restrictive but in their view would "still provide meaningful protection against the appearance of improper 'pay-to-play.'" (Pls.' Mem. at 9-11.)  As this Court has already noted, however, this sort of Congressional determination is entitled to deference, in part because Congress "is better equipped to make . . . empirical judgments" than the Court.  (Mem. Op. at 14 (quoting *Randall v. Sorrell*, 548 U.S. 230, 248 (2006).)  Plaintiffs' belief that a different provision might still "provide meaningful protection" cannot be substituted for Congress's judgment, and their wish that the law be perfectly tailored in every respect is directly at odds with the applicable "closely drawn" standard.  In any event, plaintiffs' suggested statutory amendments would likely eviscerate section 441c, given that their proposed exclusions would include virtually the entire universe of federal contracts.  (Pls.' Mem. at 10-11 (suggesting law might be amended to "[e]xclude individuals . . . who are the functional equivalent of federal employees" or "[e]xclude smaller contracts" or "[e]xclude contracts that are entered into by a process of open competitive bids" or "[e]xclude sole source contracts.")[5]  Moreover, some of plaintiffs' other proposed amendments would do little or nothing to serve the important interests

---

"individuals like plaintiffs" may not "need or want any such 'protection' from coercion" (Pls.' Mem. at 6) is beside the point.  While some contractors and potential contractors may be unconcerned about political influence — or may even welcome the opportunity to exert such influence — section 441c is designed to protect the greater interests of the public in a depoliticized contracting process and a federal election system without corruption.  Just as *Buckley* upheld FECA's contribution limits across the board even though the Court assumed that "most large contributors do not seek improper influence," 424 U.S. at 29, so too is section 441c valid as applied to plaintiffs, even if they personally would prefer not to be protected from coercion.

[5]  Several of the contracts plaintiffs identify as possible exclusions from the prohibition, such as small contracts and sole source contracts, have a streamlined process and therefore could potentially present a *greater* likelihood of politicization, rather than a diminished one.  (FEC Facts ¶ 50.)  Even relatively small contributions or contracts can result in corruption or the appearance of corruption.  (FEC Facts ¶¶ 53, 93, 107, 111, 112.)

at stake.  For example, the suggestion that contractors be permitted to make contributions, but only *after* the contract has been entered into (Pls.' Mem. at 11), would do little to prevent corruption or the appearance of corruption — a contractor could simply indicate an intention to give a contribution later on — and would do *nothing* to protect a contractor from being coerced to make a contribution once the work on the contract had begun.[6]

Third, plaintiffs' renew their underinclusive argument (Pls.' Mem. at 12-15), relying again on their earlier suggestion that section 441c is unconstitutional because people who receive federal grants or loans, or admission to the service academies, are not barred from making contributions.[7]  As this Court has explained, however, "[t]he D.C. Circuit has squarely rejected arguments of this kind, stating that 'a regulation is not fatally underinclusive simply because an alternative regulation, which would restrict *more* speech or the speech of *more* people, could be more effective.  The First Amendment does not require the government to curtail as much speech as may conceivably serve its goals.'"  (Mem. Op. at 16 (quoting *Blount v. SEC*, 61 F.3d 938, 946 (D.C. Cir. 1995).)  Plaintiffs present no new facts or law that call into question the Court's prior ruling on this point.

---

[6]     Plaintiffs suggest that their approach of identifying different ways in which the statute might be made more closely drawn is supported by the section of the *McConnell* decision that struck down a prohibition on contributions by minors.  (Pls.' Mem. at 8 n.2.)  But that prohibition was an *anti-circumvention* measure — minors were prohibited from making contributions so that parents could not use their children as conduits to make contributions that the parents would not be able to make themselves.  *McConnell v. FEC*, 540 U.S. 93, 232 (2003). In that particular situation, the Supreme Court was able to assess less restrictive anti-circumvention measures that would be equally effective.  *Id.*

[7]     Plaintiffs also note that big contributors and fundraisers are sometimes rewarded with government positions.  (Pls.' Mem. at 14-15.)  If individuals are able to obtain ambassadorships in part by contributing generously, it is "neither novel nor implausible" to assume that similar contributions could help lead to federal contracts, or at the very least, give that appearance. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000); *see also* FEC Facts ¶¶ 104-14.

In sum, the bulk of plaintiffs' recycled argument is that Congress could have drawn the lines it chose in regulating contributions by federal contractors and others differently.  Those arguments, however, should be directed to Congress itself, not to this Court.

**B.      Section 441c Serves an Important Purpose in Combating Corruption**

Corruption, the appearance of corruption, and the coercion of contractors have been genuine dangers, from the time the federal government first banned campaign contributions from federal contractors until today.  The "pay-to-play" scandals in various states discussed in cases such as *Green Party of Conn. v. Garfield*, 616 F.3d 189 (2d Cir. 2010), *cert denied*, 131 S. Ct. 3090 (2011) and *Yamada v. Weaver*, No. 10-cv-00497, 2012 WL 983559 (D. Hawaii March 21, 2012) show that pay-to-play problems are not merely a relic from the past that has been eradicated, but a real threat that requires continuing government vigilance to combat.[8]  If there is little recent evidence of federal contributions being used to influence contracting decisions, that is a credit to the efficacy of section 441c, not a reason to strike it down after 70 years on the books.[9]  (*See* Mem. Op. at 11-12 (citing *Burson v. Freeman*, 504 U.S. 191, 207 (1992).)

---

[8]      The Statement of Material Facts that accompanies this motion contains numerous additional examples of pay-to-play scandals in various jurisdictions that rely upon news accounts and other secondary sources.  (*See, e.g*, FEC Facts ¶¶ 51-124.)  Plaintiffs have expressed concern that these facts might "be used to establish material facts, or to oppose those facts that plaintiffs have designed [sic] as material facts not in dispute."  (Pls.' Mem. at 2.)  These facts, while material to the issues in this case, are legislative facts presented for the benefit of the Court and are not intended to contradict any of the adjudicative facts alleged by plaintiffs concerning their particular situations.  (*See* Defendant FEC's Opposition to Plaintiffs' Motion to Certify Facts at 6-7 (Dec. 5, 2011) (Doc. No. 11) (explaining the distinction between legislative and adjudicative facts).)

[9]      The long and widespread history of pay-to-play practices is what distinguishes this case and others like it from *Lavin v. Husted*, No. 11-3908, 2012 WL 3140909 (6th Cir. Aug. 3, 2012), which plaintiffs have cited to the Court as a supplemental authority.  (Plaintiffs' Notice of Additional Authority (Aug. 7, 2012) (Doc. No. 31).)  The law challenged in *Lavin* was struck down because there was "no evidence that prosecutors in Ohio, or any other state for that matter" have made decisions to prosecute based on campaign contributions.  *Lavin*, 2012 WL 3140909, at *3.  In contrast, there is a wealth of evidence from numerous jurisdictions that contractors

Even contributions made to candidates or political committees without a direct role in the contracting process can breed corruption and its appearance.  As this Court found, the "wall between elected federal officials and agency heads is hardly as impassable as Plaintiffs make out."  (Mem. Op. at 16.)  "Plaintiffs do not dispute . . . that elected officials can and sometimes do recommend contractors to agencies."  (*Id*.)  And there are thousands of persons appointed by the President serving at various agencies, many of whom may play a role in the contracting process.  (FEC Facts at ¶¶ 43-44 (quoting Deposition of Steven L. Schooner ("Schooner Dep." ) at 27-28, 110-12, 114-15); U.S. Senate, Committee on Homeland Security and Government Affairs, S. Prt. 110-36, Policy and Supporting Positions (2008) (listing about 8,000 positions for political appointees in the executive and legislative branches).)  These appointees can attempt to steer contracts to those who make contributions to a favored candidate or party.  *Cf., e.g., McConnell,* 540 U.S. at 146-47 & n.46 (describing how indirect influence on a variety of government decision-makers was gained by making "soft money" donations to national political parties).  In sum, as this Court correctly concluded, "there is a connection between federal elected officeholders and the awarding of contracts, albeit indirect, that supports a finding that the ban is closely drawn."  (Mem. Op. at 16.)

Even plaintiffs concede that "it is *possible* that a Member of Congress, the President, or a political appointee *might* attempt to influence the award of a federal contract," although they regard the likelihood of that happening for an individual contract as "extremely small."  (Pls.' Mem. at 7.)  But plaintiffs' subjective assessment of the likelihood of such undue influence does not matter; this quintessentially legislative judgment belongs to Congress.  While plaintiffs may believe, for example, that the procurement process at USAID "generally" succeeds at precluding

---

attempt and succeed in obtaining contracts by making campaign contributions.  (FEC Facts ¶¶ 51-90 (discussing pay-to-play scandals in various jurisdictions).)

outside influence (*id*. at 7), it is for Congress to decide how best to prevent potential corruption and the appearance of corruption, even when the risk is relatively small.  *See Buckley,* 424 U.S. at 53 n.59 (upholding limit on contributions to candidates from family members because "[a]lthough the risk of improper influence is somewhat diminished in the case of large contributions from immediate family members, we cannot say that the danger is sufficiently reduced to bar Congress from subjecting family members to the same limitations as nonfamily contributors.")

Furthermore, many federal contracts, including those awarded to plaintiffs, are awarded through streamlined processes that dispense with the open formal bidding procedures.  (See FEC Facts ¶¶ 3, 44-46, 49-50.)  Plaintiffs assert that it is "not believable" and "beyond fanciful" to think that the award of such contracts might be influenced by making a campaign contribution. (Pls.' Mem at 5, 12.)  But plaintiffs' own declarant testified as to the efficacy and usefulness of the competitive bidding process and the requirement for contracting officers who are "attuned to the need to be independent, above-board and [who are] able to explain their actions in an objective and impartial way" to help keep politics out of contracting.  (FEC Facts ¶ 43 (quoting Schooner Dep. at 136).)  It is neither unbelievable nor fanciful to believe that even small contributions might make a difference in a process "where the government can call two or three people on the phone" and make a determination on that basis.  (See FEC Facts ¶ 50 (quoting Schooner Dep. at 107).)

Lastly, even when *actual* corruption may be unlikely or difficult to prove, the government maintains an interest in fighting even the *appearance* of corruption.  Plaintiffs argue that there would be no appearance of corruption to "a reasonable person, who understands how federal contracts are let."  (Pls.' Mem. at 7.)  But plaintiffs' attempt to impose some sort of

enhanced "reasonable person" standard — one that assumes knowledge of the federal contracting system — is way off the mark and without any basis in law.  The Supreme Court has never hinted that only a specially educated subset of the public should be imagined as the focus group for determining whether certain campaign finance activity may create an appearance of corruption.  To the contrary, the Court has spoken about the public at large, the voters who choose our elected officials.  *See, e.g., Shrink Missouri*, 528 U.S. at 390 ("Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance.")  Most Americans lack familiarity with the complexities of federal contracting, and they could easily view contributions by contractors with suspicion.  Even plaintiffs' own declarant, Professor Schooner, who teaches and studies federal contracting for a living, acknowledged that "I don't know anything about how the retired annuitants [like plaintiffs Miller and Brown] and those types of contracts work" and "for all I know every agency that uses retired annuitants does it a different way."  (*See* FEC Facts ¶ 49 (quoting Schooner Dep. at 67, 81).)  The government has an interest in preventing the appearance of corruption by prohibiting contractors' campaign contributions, regardless of how they might be viewed by a small fraction of the public familiar with federal contracting law.

> **C.**     **Section 441c Is Closely Drawn Because It Creates Only a Modest Burden on Expression**

Section 441c allows ample alternative forms of political expression, even though it temporarily prevents persons who *choose* to become federal contractors from making contributions.  Federal contractors are *not* prohibited from speaking about candidates, volunteering for campaigns, raising funds for candidates or parties, blogging, or engaging in

numerous other activities in which they can express their views of candidates or public issues.
*See* 2 U.S.C. § 431(8)(B); 11 C.F.R. §§ 100.74-100.77, 100.94; FEC Facts ¶¶ 137-41.

This Court has already noted that one reason the law is closely drawn is because "persons affected by the ban have other meaningful avenues for political association and expression." (Mem. Op. at 15 (citing *Blount*, 61 F.3d at 948, and *Preston v. Leake*, 660 F.3d 726, 740 (4th Cir. 2011)).) Plaintiffs argue, however, that these alternative means of expression are of no consequence because "it is the right of the individual, not the government, to choose how she or he wishes to exercise his or her First Amendment rights . . . ." (Pls.' Mem. at 15.) But plaintiffs' argument is beside the point because the government is not *choosing* how plaintiffs express themselves. As this Court noted, this kind of restriction is a "mere 'channeling device[]'" that "'cut[s] off the avenue of association and expression that is most likely to lead to corruption but allow[s] numerous other avenues of association and expression.'" (Mem. Op. at 14 (quoting *Preston*, 660 F.3d at 734).) Plaintiffs cite no supporting authority for their argument, which is also directly contradicted by cases such as *Letter Carriers* and *Buckley*, each of which held that it was constitutional to limit certain types of expression while permitting other types.

Furthermore, section 441c's prohibition is modest because it applies only while a contract is being negotiated or performed. If an individual wishes to make a contribution, that person can do so simply by completing the contract with the government, or by not entering into one in the first place. As this Court has noted, "Plaintiffs voluntarily chose to become federal contractors and are only subject to the ban for as long as they continue to make that choice." (Mem. Op. at 15 (citing *Preston*, 660 F.3d at 740).)

**D.      Section 441c's Constitutionality Is Not Called into Question by Either Its Legislative History or Congress's Decision Not to Amend the Provision**

Plaintiffs also attack the constitutionality of section 441c by arguing that Senator Hatch, one of the bill's original sponsors, may have used a flawed constitutional analysis when he expressed support for the law prior to its passage.  (Pls.' Mem. at 12-13 n.3 (quoting Remarks of Senator Hatch, 86 Cong. Rec. 2563 (March 8, 1940).)  But legislative history is relevant in certain circumstances to help understand the purpose and meaning of a statute — it makes no difference whether Congress was wrong about why a particular law is constitutional.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S.Ct. 2566, 2598 (2012) (upholding the Affordable Care Act on a constitutional basis other than the one relied upon by Congress because "[t]he 'question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise'" (quoting *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948))).

Plaintiffs also argue that Congress's failure to amend the law during the past 72 years somehow suggests that it may not be closely drawn.  (Pls.' Mem. at 16.)  Plaintiffs provide absolutely no authority for this novel approach to judging the constitutionality of a statute, and its flaws are readily apparent.  Nothing in the Constitution remotely suggests that Congress is required to explicitly reaffirm every law on the books every few years, nor is it the courts' role to examine whether Congress has done so.  Such a means of constitutional review would be completely unworkable and raise serious separation of power concerns; plaintiffs can offer no explanation of how a court might judge whether Congress has sufficiently reconsidered previously enacted legislation and justified keeping it in the United States Code.

In any event, plaintiffs are wrong to assume that Congress has failed to consider the ban on contractor contributions since its passage.  Both the Hatch Act and FECA have been amended

multiple times since 1940.  (FEC Facts ¶¶ 32, 34-35.)  Congress's decision to amend other

provisions — while leaving the contractor ban intact — strongly suggests that Congress believes

that the provision continues to serve important interests.  *Cf. United States v. Fausto*, 484 U.S.

439, 453 (1988) ("[I]t can be strongly presumed that Congress will specifically address language

on the statute books that it wishes to change.")

Finally, to the extent that scandals involving federal contractors are relatively infrequent,

that suggests that Congress's efforts to depoliticize the government contracting process have

been highly effective in changing both the practice and perception of political patronage in the

federal system.  This improvement in the realm of federal contracting presents a contrast to the

attitude in certain states and municipalities that still regard pay-to-play as "how business is done"

and where participants "don't even know it's wrong anymore."  (FEC Facts ¶¶ 55, 58 (quoting

reports about scandals in New Mexico and Ohio).)  Any time a statute modifies behavior and

helps make compliance the norm — whether it is a reduction in race or gender discrimination,

increase in seatbelt use, or decrease in corruption in federal contracting — a cultural shift in

social expectations is likely to work in tandem with the law to create a virtuous cycle of

increasing compliance.  But that cycle could turn vicious if the law that started the improvements

in the first place were suddenly overturned.  Plaintiffs' attempt to strike down a provision that

has served the nation well for more than 70 years amounts to little more than a claim that it has

worked so well it is no longer needed, but that argument has no colorable basis in fact or law.

## II.    SECTION 441c SATISFIES THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT

### A.    Because the Contribution Ban Does Not Infringe a Fundamental Right, It Receives a More Lenient Standard of Review

This Court previously determined that plaintiffs' equal protection claim should receive

the same intermediate level of scrutiny as the First Amendment claim — "closely drawn to

match a sufficiently important interest." (Mem. Op. at 21 (quoting *Beaumont*, 539 U.S. at 161).)
The FEC maintains that section 441c should not be subject to intermediate scrutiny — rather, the
appropriate standard is rational basis review. This case involves neither a suspect class nor a
fundamental right identified by the Supreme Court. (Mem. Op. at 17-19). Although the
Supreme Court has sometimes applied intermediate scrutiny in equal protection cases, those
cases all involve instances of "quasi-suspect" classes. (*See id.* at 20 (discussing the application
of intermediate scrutiny in equal protection cases, citing *Adarand Constructors, Inc. v. Slater*,
528 U.S. 216, 219 (2000) (noting the existence of intermediate scrutiny for "cases involving
classifications on a basis other than race"); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724
(1982) (gender); *Mills v. Habluetzel*, 456 U.S. 91, 98 (1982) (illegitimate children)).) We are
aware of no Supreme Court case that has ever applied intermediate scrutiny to protect something
akin to a quasi-fundamental right, and plaintiffs do not assert — and they cannot — that
individual federal contractors are a "suspect" or "quasi-suspect" class. In the absence of such a
right or class, the Supreme Court has applied rational basis review.

But even under the intermediate scrutiny that this Court previously applied, section 441c
does not violate the equal protection guarantee of the Fifth Amendment.[10] As the Court
determined at the preliminary injunction stage, even under this higher standard of review, "the
various comparison groups suggested by Plaintiffs are not similarly situated to individual
contractors subject to § 441c ." (Mem. Op. at 26.)

---

[10]     Contrary to plaintiffs' baseless assertion (Pls.' Mem. at 17), the Commission has not
"conceded" that section 441c is unconstitutional under this higher standard of review. The FEC
previously argued that the law withstood rational basis review because that was the standard it
believed was applicable, not because it was the only standard the law could meet. By the same
token, plaintiffs argued previously that strict scrutiny was the appropriate standard, but do not
appear to have now conceded that the law is constitutional.

B.      **Equal Protection Analysis Must Consider the Statute as a Whole to Determine Whether Differential Treatment Is Constitutional**

As this Court has stated, under any standard of review, a court reviewing a law challenged for violating equal protection must determine "whether 'an appropriate government interest [is] suitably furthered by the differential treatment.'" (Mem. Op. at 22 (quoting *Police Dept. of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)).) The Court must "'consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.'" (*Id.* (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)).) The statute and context must be considered in its entirety.

In *California Med. Ass'n v. FEC*, 453 U.S. 182 (1981), the Supreme Court took this kind of holistic approach in reviewing an equal protection claim against a (different) provision of FECA. An unincorporated association challenged the limits on the contributions it could make to political committees. As in this case, the plaintiff association claimed both a violation of the First Amendment and the equal protection guarantee of the Fifth Amendment. The plaintiffs argued that corporations were treated more favorably due to the corporations' ability to spend unlimited sums for the administrative and solicitation expenses of their separate segregated funds ("SSFs" — often referred to as "PACs"). *Id.* at 200; *see also* 2 U.S.C. § 441b(b). After concluding that there was no First Amendment violation, the Court also rejected the equal protection claim: "Appellants' claim of unfair treatment ignores the plain fact that *the statute as a whole* imposes far *fewer* restrictions on individuals and unincorporated associations than it does on corporations and unions." *Cal Med. Ass'n*, 453 U.S. at 200 (first emphasis added). The Court went on to describe *other* parts of the statute, which were not part of the constitutional challenge, and which favored the plaintiffs' interests over corporations. It noted that "differing restrictions placed on individuals and unincorporated associations, on the one hand, and on

15

unions and corporations, on the other, reflect a judgment by Congress that these entities have

differing structures and purposes, and that they therefore may require different forms of

regulation in order to protect the integrity of the electoral process." *Id.* at 201.

 The same equal protection analysis is properly invoked here.  But instead, plaintiffs'

equal protection argument rests on a cramped and disaggregated analysis in which a single

provision is viewed in isolation against a single governmental objective to determine whether the

provision passes muster.  Plaintiffs also limit their inquiry to only the government interest in

thwarting pay-to-play and ignore the interest in preventing coercion of federal contractors.[11]  For

example, plaintiffs state that the "only perspective that is relevant" is whether "plaintiffs [are]

being treated equally as compared to corporate contractors and their officers, directors,

shareholders, and employees in terms of avoiding the appearance of 'pay-to-play" from the

making of political contributions . . . ."  (Pls.' Mem. at 20.)  Plaintiffs then repeatedly fail to

consider other provisions that are part of the overall regulatory scheme:  for example, the Hatch

Act's different restrictions on government employees and the ability of individuals to enter into

contracts with the government through an LLC.  Plaintiffs' approach is out of step with the

Court's holistic approach adopted in *California Medical Association.*

---

[11] Plaintiffs restrict their analysis to the government interest in preventing pay-to-play corruption because they mistakenly "do not understand the FEC to argue (or the Court to have found) that the avoidance of coercion rationale is different for plaintiffs than for the others." (Pls.' Mem. at 18.)  To the contrary, both the Commission and the Court noted at the preliminary injunction stage that, for example, federal employees have greater civil service protection than do federal contractors and are thereby potentially less prone to being coerced and not similarly situated in that regard.  (Defendant FEC's Opposition To Plaintiffs' Motion for a Preliminary Injunction at 33 & n.25 (Mar. 1, 2012) (Doc. No. 25); Mem. Op. at 23.)

C.      **The Differential Treatment Between Federal Contractors and Federal Employees Is Constitutional**

As this Court previously found, the "restrictions on federal contractors' freedoms of expression and association are different from those on federal employees, but not necessarily more severe."  (Mem. Op. at 24; *see also* FEC Facts ¶ 142.)  Plaintiffs' arguments in support of their motion for summary judgment add nothing new to those already rejected by the Court at the preliminary injunction stage.

Federal employees and federal contractors are not the same and therefore are justifiably treated differently in numerous ways.  (FEC Facts ¶¶ 147-51.)  Even the plaintiffs "do not argue that the situations [of federal contractors and federal employees] are identical," but merely that the two groups are "sufficiently close" that the law is unjustifiable for prohibiting contributions from only contractors.  (Pls.' Mem. at 24.)  But this amounts, again, to plaintiffs asking the Court to substitute its judgment for that of the legislature.  Especially in light of the many different occupations and functions of workers *within* the two categories (federal employees versus federal contractors), it is particularly difficult to assess whether these groups are "sufficiently close" to each other.  Federal employees perform innumerable different duties for different agencies, as do federal contractors.  The Hatch Act establishes different restrictions for employees of different agencies for this very reason.  (FEC Facts ¶ 142.)[12]  It is Congress's role to draw these fine and complex lines; the courts have "no scalpel to probe" with such specificity.  *Buckley*, 424 U.S. at

---

[12]      Plaintiffs make the novel argument that the regulation preventing FEC employees from making certain contributions is not actually a prohibition on contributions, but a restriction merely on the specific manner by which contributions can be *delivered*.  (Pls.' Mem. at 21 (citing 5 C.F.R. § 734.413).)  Plaintiffs cite no authority for this bizarre reading of the regulation in which FEC employees would be permitted to "financially support[ ] a Member of Congress so long as the contribution is made through a means such as the Internet or mail, so that the Member would never see or touch it."  (*Id.*)

30; *see also Randall*, 548 U.S. at 248 ("We cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives.").

As the Court noted (Mem. Op. at 23), one critical distinction between federal employees and contractors is that only the former are protected by the Merit Systems Protection Board ("MSPB"), which has the power to hear and decide complaints when an agency is alleged to have violated Merit System Principles governing federal employment. *See* 5 U.S.C. §§ 1201-1209, 1214-15, 2301(b)(1)-(2).  Two such Merit System Principles are that "[a]ll employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation" and that "[e]mployees should be . . . protected against . . . coercion for partisan political purposes . . . ."  5 U.S.C. §§ 2301(b)(2), (b)(8)(A).  Plaintiffs suggest that this difference is insubstantial because contractors still have "contractual and statutory rights that provide protections and guard against arbitrary agency action . . . as well as the Due Process Clause."  (Pls.' Mem. at 23.)  But plaintiffs make no effort to explain what sort of contractual and statutory rights they are describing, nor do they offer any legal support or even argue for the proposition that the Merit System's protections are coextensive with the guarantees of the Due Process Clause.  The MSPB exists for the purpose of ensuring that federal employment is based on merit.  There is no comparable institution for federal contracting, and it therefore is sensible that Congress might take additional precautions to assure the meritorious awarding of contracts, such as by prohibiting contractors' campaign contributions.[13]

---

[13]     Contractors working for the federal government do not typically receive the same benefits as employees, can be required to have email addresses and badges that distinguish them from employees, and can even be required to answer the telephone in a different manner.  (FEC Facts ¶¶ 148, 151 (citing Schooner Dep. at 73-75).)  These seemingly minor details, in the

### D.     The Differential Treatment Between Individual Contractors and Corporate Contractors Is Constitutional

Both corporate contractors and individual contractors are prohibited from making campaign contributions — *see* 2 U.S.C. §§ 441b(a), 441c — so if those two groups are compared, *there is no differential treatment.*  Employees and officers of corporate contractors can make contributions in their capacity as individuals because they do not personally have federal contracts.  Plaintiffs will likewise be able to make contributions when they no longer have their own direct contracts with the federal government.

Plaintiffs argue that they are unconstitutionally treated less favorably than corporate contractors because only a corporation may establish an SSF and solicit money from its "stockholders and their families and its executive or administrative personnel and their families" for the purpose of making contributions.  2 U.S.C. §§ 441b(b)(4)(A)(i); 441c(b).  In contrast to this "direct and easy path" by which corporations can make contributions, plaintiffs argue, "individuals have no means by which to accomplish their goal of making political contributions . . . ."  (Pls.' Mem. at 18.)  This argument lacks merit for several reasons.

First, the very existence of SSFs was intended by Congress to make evident that the corporation is *not* the entity making the contribution, and therefore plaintiffs' notion that using an SSF is a "direct and easy path" for a corporation to make a contribution is wide of the mark. While plaintiffs believe that "no person with knowledge of the facts would perceive [a PAC contribution as different from a corporate contribution]" (Pls.' Mem. at 19), that is not a view

---

aggregate, also rebut the plaintiffs' suggestion that federal employees and contractors are similarly situated overall.

Finally, plaintiffs devote a page of their brief rebutting the argument that "[b]ecause federal employees do not need new contracts or renewals, the FEC argues, they would have nothing to gain from making contributions or lose from not making them, which makes [federal employees and federal contractors] not comparable."  (Pls.' Mem. at 23.)  Plaintiffs have rebutted a straw man, however, because the FEC has never made this argument.

shared by Congress, which codified the regime of separate segregated funds in FECA.  Nor is it

the view of the Supreme Court, which has held that there exists a sufficient justification for

FECA's requirement that corporations establish an SSF for making contributions rather than

making them directly from their corporate treasuries.  *See Beaumont*, 539 U.S. at 147-48.

Indeed, the holding in *Citizens United* rested in part on the Court's determination that

"[a] PAC is a separate association from the corporation."  *Citizens United v. FEC*, 130 S. Ct.

876, 897 (2010).  The Court held that a PAC's ability to make independent expenditures was

insufficient to alleviate the First Amendment burdens on corporations because the PAC option

still "does not allow corporations to speak."  *Id.*  Thus, plaintiffs' argument that the treatment of

PACs and corporations in § 441c is inconsistent with *Citizens United* (Pls.' Mem. at 19-20) is

exactly backward:  corporations with federal contracts cannot make contributions, but PACs can,

precisely because they are separate and distinct entities.  As this Court explained (Mem. Op.

at 25), "[i]ndividual federal contractors, accordingly, are not similarly situated to PACs or

officers of contracting corporations; as a result, their disparate treatment does not present an

equal-protection problem."

In addition, the notion that individual contractors lack a "direct and easy path" to make

contributions is belied by the plaintiffs' acknowledgment that they could establish a corporate

form, such as an LLC, enter into contracts with the government through their LLC, and remain

free to make contributions as individuals.  (Plaintiffs' Statement of Undisputed Material Facts ¶¶

5, 10-11 (Doc. 30-2).)  This path is not meaningfully different from that of a corporation

establishing an SSF.  Plaintiffs claim that there are "significant costs" associated with

establishing an LLC, but only reach that conclusion by hypothetically including the costs of

lawyers and accountants (as well as LLC taxes that might otherwise be paid as individual taxes

in the absence of a corporate form).  (*Id.* at ¶ 10.)  But hiring these professionals would also drive

up the costs of creating an SSF for a corporation.  And in any event, it is unnecessary to take

such elaborate measures to create an LLC.  For example, Maryland requires only a one-page

form and payment of $141.  *See* Md. State Dep't of Assessments and Taxation, Articles of

Organization for LLC form and instructions, http://www.dat.state.md.us/sdatweb/artorgan.pdf.

If corporate contractors have a "direct and easy" path to make contributions, then so do

plaintiffs.

## III.     CONCLUSION

        For the reasons stated above — and for the reasons set forth in the Court's opinion

denying plaintiffs' motion for a preliminary injunction — the Court should uphold 2 U.S.C.

§ 441c and grant summary judgment to the Commission.

                                        Respectfully submitted,

                                        Anthony Herman (D.C. Bar No. 424643)
                                        General Counsel

                                        David Kolker (D.C. Bar No. 394558)
                                        Associate General Counsel

                                        Lisa J. Stevenson (D.C. Bar No. 457628)
                                        Special Counsel to the General Counsel

                                        Harry J. Summers
                                        Assistant General Counsel

                                        Holly J. Baker
                                        Attorney

                                        /s/ Seth Nesin
                                        Seth Nesin
                                        Attorney

                                        COUNSEL FOR DEFENDANT
                                        FEDERAL ELECTION COMMISSION
                                        999 E Street, NW

Washington, DC  20463
Telephone:  (202) 694-1650
August 15, 2012                              Fax:  (202) 219-0260

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
WENDY E. WAGNER, *et al.*,               )
                                        )
                Plaintiffs,              )
                                        )        Civil Action No. 11-cv-1841-JEB
        v.                               )
                                        )        STATEMENT OF
FEDERAL ELECTION COMMISSION,             )        GENUINE ISSUES
                                        )
                Defendant.               )
_____ )

## DEFENDANT FEDERAL ELECTION COMMISSION'S
## STATEMENT OF GENUINE ISSUES

Pursuant to LCvR 7(h), defendant Federal Election Commission ("Commission" or

"FEC") respectfully submits the following Statement of Genuine Issues in response to Plaintiffs'

Statement of Undisputed Material Facts (Docket 30-2).

1.      Plaintiffs are individuals who currently have contracts with federal agencies under
which they are providing personal services to an agency and for which payments are made from
funds appropriated by Congress. Declaration of Wendy E. Wagner ¶ 3 ("Wagner ¶ __");
Declaration of Lawrence M. E. Brown ¶ 4, 5 ("Brown ¶ __"); & Declaration of Jan W. Miller ¶
4, 5 ("Miller ¶__"). As such, they are subject to section 441c, under which it is unlawful for
plaintiffs, as government contractors, to make any contribution to candidates for federal office
and/or to political parties and/or political committees in connection with elections for federal
offices.

        FEC RESPONSE:      No response.

2.      Each plaintiff has, prior to becoming a government contractor, made contributions
to candidates for federal office and/or to political parties, and/or political committees in
connection with elections for federal offices, either individually or jointly with his or her spouse.
Wagner ¶ 6; Brown ¶ 6; Miller ¶ 7. Each plaintiff desires to make contributions in connection
with federal elections, including the 2012 elections, but is barred from doing so by section 441c
and will not do so unless protected by a court order. Wagner ¶ 6; Brown ¶ 6, 7, 8; & Miller ¶ 7.

        FEC RESPONSE:      No response.

3.      This action challenges the constitutionality of section 441c, which is a provision within FECA. The defendant is the Federal Election Commission (the "FEC") which is the federal agency with the primary responsibility to enforce FECA, including section 441c. Each of the plaintiffs is a registered voter and is eligible to vote in federal elections in 2012. Wagner ¶ 6; Wagner Supplemental Declaration ¶ 2; Brown ¶ 1; Brown Supplemental Declaration ¶ 1; & Miller ¶1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

FEC RESPONSE:      With respect to the second sentence, the Commission notes that it

has civil enforcement authority for FECA, and that the Department of Justice has criminal

enforcement authority for the statute.  No response to the remainder of the paragraph.

4.      The contracts under which the plaintiffs are performing personal services for their agencies were negotiated and signed by officials of those agencies. Wagner ¶ 3; Brown ¶ 5; Miller ¶ 6; Declaration of Jeffrey Lubbers ¶ ¶ 3, 4 ("Lubbers ¶ __"); Declaration of Jonathan Tiemann ¶ 4 ("Tiemann ¶__"); & Declaration of Steven L. Schooner ¶ 3 ("Schooner ¶__"). All of those officials were appointed and not elected to their positions. Neither the President, the Vice President, any Member of Congress, nor any official of any political party or political committee had any role in the negotiation, approval, or implementation of the contracts under which plaintiffs are performing personal services for their federal agencies. Wagner ¶ 3; Brown ¶ 5; Miller ¶ 6; Schooner ¶ 3.

FEC RESPONSE:      No response to the first two sentences.  With respect to the third

sentence, the Commission notes that, although plaintiffs have stated that they are unaware of any

involvement by the specified types of office holders or officials in the awarding or performance

of their contracts, the record does not show that there was in fact no such involvement, and the

record does reflect the involvement of at least one political appointee in the negotiation and

performance of plaintiff Wagner's contract, as well as interactions by plaintiffs Brown and

Miller with at least one political appointee in the performance of their contracts.  (Wagner ¶ 3 ("I

was first approached about doing the work covered by my contract by Jonathan Siegel, the

Research Director for ACUS.  The other persons at ACUS with whom the contract was discussed

before we reached an agreement included the Chairman, Paul Verkuil, who is appointed to that

position by the President and confirmed by the Senate."); Response of Wendy E. Wagner to FEC

Request for Admission ("RFA") Nos. 14, 15, Pls.' App. at 40 (Wagner interacted with ACUS

2

Chairman in the negotiation and performance of her contract); Response of Jan W. Miller to FEC

RFA No. 18, Pls.' App. at 149 (Miller has interacted with at least one political appointee in the

performance of his current federal contract); Response of Lawrence M.E. Brown to FEC RFA

No. 18, Pls.' App. at 61 (Brown has interacted with at least one political appointee in the

performance of his current federal contract).)

     5.     Federal agencies regularly enter into contracts with both individuals and
corporations, including Limited Liability Companies ("LLCs") that are essentially one person
entities that have been incorporated. Schooner ¶¶ 6, 7. The agencies that utilize personal services
contracts make no distinctions between contracts with individuals and with LLCs, provided that
the services are rendered by the individuals specified. *Id;* Tiemann ¶ 5.

     FEC RESPONSE:     With respect to the first sentence, the Commission notes that

"regularly" is ambiguous.  With respect to the second sentence, the record only indicates that the

Department of Labor was willing to enter into a contract with Mr. Tiemann individually or with

his LLC.  (Tiemann ¶ 5.)  The record does not make clear that agencies using personal services

contracts generally make no distinctions between contracts with individuals and with LLCs.

Professor Steven Schooner testified that he did not know whether retired annuitants, such as

plaintiffs Miller and Brown, would be permitted to contract with the government through an

LLC.  (Deposition of Steven L. Schooner ("Schooner Dep.") at 120.)

     6.     Plaintiffs Brown and Miller and other individuals who provide similar services for
their agencies work directly with employees of those agencies and perform the same types and
kinds of services that employees perform. From an operational perspective, agencies generally
treat employees and contracting individuals in the same manner. Brown ¶ 4; Miller ¶ 6;
Lubbers ¶ 6.

     FEC RESPONSE:     With respect to the first sentence, the Commission notes that the

phrases "similar services" and "the same types and kinds of services" are ambiguous.  With

respect to the second sentence, the Commission notes that employees and federal contractors are

treated differently in numerous respects, for example:  (1) federal employees have clearly

established statutory civil service protections that federal contractors do not (Schooner Dep.

at 72-73, 80); (2) federal contractors are often required to have email addresses and badges that

distinguish them from employees, and contractors can even be required to answer the telephone

in a different manner (Schooner Dep. at 73-74); and (3) the normal benefits that accompany

federal employment are not typically given to contractors (Schooner Dep. at 75).

7.　　　Agency employees are not subject to the ban on contributions under section 441c, which applies to individual contractors such as plaintiffs. Most federal employees are permitted to make contributions in connection with federal elections unless "the person receiving such contribution is the employer or employing authority of the person making the contribution." 18 U.S.C. § 603.

FEC RESPONSE:　　No response.

8.　　　Corporations that have contracts with federal agencies are also forbidden from making contributions in connection with federal elections, but subsection 441c(b) allows them to establish separate segregated funds to make such contributions. The costs of establishing and administering those separate funds, and of soliciting contributions to those funds, may be paid for by their corporate sponsor, whose name is required by 2 U.S.C. § 432(e)(5) to be part of the name of the fund. Individuals such as plaintiffs are not permitted to establish such funds, and the ban in section 441c applicable to individuals applies even where the money for a contribution comes from an independent source and not from their earnings under a government contract. FEC Advisory Opinion 2008-11 (Exhibit B to Brown Declaration).

FEC RESPONSE:　　No response.

9.　　　The prohibition in section 441c on corporate contributions applies only to the corporation itself and does not apply to individuals who are directors, officers, employees, or stockholders of the corporation, including corporations for which an individual is the sole officer, employee, and stockholder. FEC Advisory Opinion 2008-11. Such directors, officers, employees, and stockholders may make contributions in connection with federal elections to candidates, political committees, and political parties using funds that were earned by the corporation from a government contract and paid as salary and/or dividends to such directors, officers, employees, and/or stockholders making the contribution. *Id.*

FEC RESPONSE:　　No response.

10.　　If a plaintiff established an LLC or other similar corporate entity, and if the plaintiff's agency were willing to have its contract be with the plaintiff's corporation and not with the plaintiff individually, only the corporation would remain subject to section 441c. *Id.* There are significant costs involved in establishing and maintaining an LLC, which include the fee charged by the state for incorporation, fees charged by lawyers or others to do the

4

incorporation, annual fees paid to the state for retaining the corporate license, fees charged to accountants or others to prepare the tax returns for the LLC, and any taxes that the LLC might owe in addition to the taxes owed by the owner of the LLC. Tiemann ¶ 3; Deposition of Steven L. Schooner ("Schooner Dep.) at 118-19.

      FEC RESPONSE:     No response to the first sentence.  With respect to the second

sentence, the term "significant costs" is ambiguous, and several of the costs identified in the

sentence are not necessary components of incorporating as an LLC.  For example, establishing

an LLC in Maryland requires only a one-page form and payment of $141.  *See* Md. State Dep't

of Assessments and Taxation, Articles of Organization for LLC form and instructions,

http://www.dat.state.md.us/sdatweb/artorgan.pdf.

     11.    Federal agencies are generally indifferent to whether a contract to provide services to the agency is with the individual who will perform such services or with his or LLC, provided that it is clear that the individual (the key personnel) will be providing the contracted-for services. Lubbers ¶ 8; Schooner ¶ 8; Tiemann ¶ 5; Schooner Dep. at 118-19.

      FEC RESPONSE:     The Commission incorporates its Response to proposed Fact No. 5,

*supra*.

     12.    Neither section 441c nor any other federal law bans individuals who receive other kinds of payments from money appropriated by Congress from making political contributions in connection with federal elections. Such other payments including those set forth in 2 C.F.R. § 180.970 (2010), such as grants, loans, loan guarantees, subsidies, and "payments for specified uses." Plaintiff Wagner has a grant of $45,721 from the National Science Foundation (Wagner ¶ 4), but that does not bar her from making political contributions as does section 441c.

      FEC RESPONSE:     Regarding the first sentence, the Commission notes that foreign

nationals may receive money appropriated by Congress and that 2 U.S.C. § 441e prohibits them

from making contributions or donations in connection with federal, state, or local elections.  No

response to the second or third sentences.

     13.    Plaintiffs Brown and Miller are retired federal civil servants who now have contracts with the agency (USAID) by which they were formerly employed. Brown ¶ ¶ 3-5; Miller ¶¶ 4-6. They regularly work alongside of federal civil service employee doing the same kind of work that the regular employees do. *Id.* Plaintiff Wagner is a fulltime law professor who

was contacted by the agency with which she has a contract to undertake a study and make a report on an issue on which the agency wanted her expert advice. Wagner ¶¶ 2-3.

       FEC RESPONSE:     No response.

      14.     The contracting officers that have the authority over federal contracts are specially trained for their positions, their decisions are made independently and based only on factors relevant to the contract at issue, and there is supposed to be no involvement of elected officials in those decisions. Schooner Dep. at 24-28, 51-54, 56-60, 94-98, 109-116, & 137.

       FEC RESPONSE:     The Commission objects to this proposed Fact as incomplete,

partially inconsistent with the record, and ambiguous in its use of the phrases "relevant to the

contract" and "supposed to be."  While contracting officers are trained to award contracts in a

non-political manner, the contracting officer generally "must rely on the expertise and

information" of other employees in the award of a contract.  (Schooner Dep. at 110-112.)

Furthermore, normal competitive bidding procedures may be bypassed in the case of

"a fundamental group of core exemptions" such as "the classic public interest and national

security exemptions" or "if there is an industry where prices are set by law or regulation."

(Schooner Dep. at 27-28.)  There are also streamlined procedures for certain types of contracts

— for example, an agency awarding a contract to an expert witness or an alternative dispute

resolution mediator need not go through the ordinary procedures.  (Schooner Dep. at 24-26,

29-30; Tiemann ¶ 4 ("All of my discussions prior to signing the contract and since then have

been with attorneys in the Solicitor's Office, although eventually a person designated as a

contracting officer signed the contract").)  Indeed, the current ACUS contract of plaintiff Wagner

appears to have been the result of such a streamlined procedure.  (1st Wagner Decl. ¶ 3; Wagner

Response to FEC RFA Nos. 14, 15, Pls.' App. at 40.)  And the awarding of personal service

contracts like those of plaintiffs Brown and Miller is not "subject to full and open competition

and the full range of rights and responsibilities that follow that."  (Schooner Dep. at 89; *see also*

*id.* at 87.)  As a result, the award and performance of these contracts is not even "evaluated by a contracting officer."  (*Id.* at 104.)  Furthermore, for all contracts of less than $150,000 (or even higher value contracts in some instances) "there are streamlined competitions, where the government can call two or three people on the phone and operate in a very informal manner."  (*Id.* at 107.)  "[T]here are many types of smaller contracts that have very flexible award authorities."  (*Id.* at 108.)

In fact, the FEC's Statement of Material Facts includes many examples of federal contracting decisions that appear not to have been made solely on the basis of legitimate factors. (FEC Facts ¶¶ 105-114.)  Moreover, plaintiffs have admitted that federal officeholders and political appointees have in fact influenced the selection of federal contractors, including individual contractors (Wagner Response to FEC RFA Nos. 1-2, Pls.' App. at 37-38; Brown Response to FEC RFA Nos. 1-2, Pls.' App. at 58; Miller Response to FEC RFA 1-2, Pls.' App. at 146-47); that at least one political appointee was involved in the negotiation and performance of plaintiff Wagner's current contract (Wagner Response to FEC RFA Nos. 14, 15, Pls.' App. at 40); and that plaintiffs Brown and Miller interacted with at least one political appointee in the performance of their current contracts  (Brown Response to FEC RFA No. 18, Pls.' App. at 61; Miller Response to FEC RFA No. 18, Pls.' App. at 149).

Respectfully submitted,

Anthony Herman
General Counsel

David Kolker (D.C. Bar No. 394558)
Associate General Counsel

Lisa J. Stevenson (D.C. Bar No. 457628)
Special Counsel to the General Counsel

Harry J. Summers
Assistant General Counsel

Holly J. Baker
Attorney

/s/ Seth Nesin
Seth Nesin
Attorney

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
(202) 694-1650

August 15, 2012