**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WENDY WAGNER,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 11-1841 (JEB)** |
| **FEDERAL ELECTION COMMISSION,** | |
| **Defendant.** | |

**<u>MEMORANDUM OPINION</u>**

While foes of campaign-finance laws have repeatedly and successfully challenged limits on political expenditures, limits on political contributions have escaped relatively unscathed. Plaintiffs in this suit aim to change that trend. They seek to invalidate one of the harshest contribution restrictions in the U.S. Code: a full-blown ban on political contributions by federal contractors. <u>See</u> 2 U.S.C. § 441c. The Court has already denied Plaintiffs' motion for a preliminary injunction, concluding that they were unlikely to succeed on the merits of their claim. <u>See</u> <u>Wagner v. FEC</u> (<u>Wagner I</u>), 854 F. Supp. 2d 83 (D.D.C. 2012). The parties have now renewed their battle by filing Cross-Motions for Summary Judgment. On revisiting the previous decision, the Court reaches the same conclusion: Congress may constitutionally bar federal contractors from contributing to candidates, parties, and their committees.

**I.      Background**

In its pervasive regulation of money in federal elections, the Federal Election Campaign Act reserves a special place for federal contractors. Under 2 U.S.C. § 441c, entitled "Contributions by government contractors," no one who contracts with the Federal Government may contribute, directly or indirectly, to any political party, committee, or candidate for public

1

office, or to any person for any political purpose or use.  Nor may anyone promise or solicit such

a contribution.

In full, the statute provides:

> It shall be unlawful for any person –
> (1) who enters into any contract with the United States or any department or agency thereof either for the rendition of personal services or furnishing any material, supplies, or equipment to the United States or any department or agency thereof or for selling any land or building to the United States or any department or agency thereof, if payment for the performance of such contract or payment for such material, supplies, equipment, land, or building is to be made in whole or in part from funds appropriated by the Congress, at any time between the commencement of negotiations for and the later of (A) the completion of performance under; or (B) the termination of negotiations for, such contract or furnishing of material, supplies, equipment, land, or buildings, directly or indirectly to make any contribution of money or other things of value, or to promise expressly or impliedly to make any such contribution to any political party, committee, or candidate for public office or to any person for any political purpose or use; or
> (2) knowingly to solicit any such contribution from any such person for any such purpose during any such period.

2 U.S.C. § 441c(a).  "Person" is defined broadly to include "an individual, partnership,

committee, association, corporation, labor organization, or any other organization or group of

persons" other than the Federal Government.  2 U.S.C. § 431(11).  The prohibition does not

apply, however, to contributions by separate segregated funds (a type of political action

committee, or PAC) of contracting corporations and related entities.  See 2 U.S.C. § 441c(b).

The FEC interprets § 441c to prohibit only contributions in connection with federal elections.

See 11 C.F.R. § 115.2(a) ("This prohibition does not apply to contributions or expenditures in

connection with State or local elections.").

Plaintiffs are three individuals with federal contracts.  One has a sole-source (i.e., no-bid)

contract for $12,000 to prepare a report on how agencies can use science more effectively for the

Administrative Conference of the United States.  <u>See</u> Decl. of Wendy E. Wagner, ¶ 3.  Another

Plaintiff supervises federal employees for the U.S. Agency for International Development,

earning $598.08 per day – about $150,000 if he works full time.  <u>See</u> Decl. of Lawrence M.E.

Brown, ¶¶ 4-5.  The last is a policy adviser for USAID, earning $596 per day.  <u>See</u> Decl. of Jan

W. Miller, ¶ 5.  The two Plaintiffs who contract with USAID formerly worked for that agency as

federal employees and accrue benefits in the same manner as employees.

Each Plaintiff has previously contributed to federal candidates, parties, or committees and

wishes to do so again.  <u>See</u> Wagner Decl., ¶ 6; Brown Decl., ¶ 6; Miller Decl., ¶ 7.  Section 441c

blocks them from making such contributions.  According to Plaintiffs, § 441c thereby violates

the First Amendment and the equal-protection guarantee in the Fifth Amendment Due Process

Clause.

At first, Plaintiffs filed suit under 2 U.S.C. § 437h, which requires a district court to

certify constitutional questions about FECA to its *en banc* appellate court.  Plaintiffs changed

their minds, however, and amended their complaint to follow the standard path of federal

litigation.  <u>See</u> <u>Wagner I</u>, 854 F. Supp. 2d at 86.  They are permitted to do so, and this Court has

jurisdiction under 28 U.S.C. § 1331.  <u>See</u> <u>Bread PAC v. FEC</u>, 455 U.S. 577, 585 (1982)

("plaintiffs meeting the usual standing requirements can challenge provisions of the [Federal

Election Campaign] Act under the federal-question jurisdiction granted the federal courts by 28

U.S.C. § 1331").

Plaintiffs then moved for a preliminary injunction.  This Court denied their motion,

concluding that they did not have a likelihood of success on the merits of their claims.  <u>See</u>

<u>Wagner I</u>, 854 F. Supp. 2d 83.  After further discovery, both parties have now filed Motions for

Summary Judgment.  The parties agree that these Motions supplement – rather than replace – the

preliminary-injunction briefs and record.  See Pls. Mot. at 1; FEC Mot. at 1 n.1.  The new

Motions, therefore, focus on the parties' disagreements with Wagner I.  The Court also held a

hearing on two specific issues: whether Plaintiffs challenge restrictions on contributions to

independent-expenditure groups and what level of scrutiny applies to the equal-protection claim.

See Order, Oct. 26, 2012.  Like the briefs, this Opinion supplements – rather than replaces –

Wagner I and focuses on the new objections.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at

895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477

U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely

disputed must support the assertion" by "citing to particular parts of materials in the record" or

"showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-

movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor."

Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006);

Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for

summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249-50.

## III.   Analysis

The Court begins with the First Amendment challenge to § 441c, then moves to the equal-protection argument.

### A.   First Amendment

Plaintiffs accept the contribution limits generally applicable to federal elections, see, e.g., 2 U.S.C. § 441a(a)(1)(A) ($2000 limit on contributions "to any candidate and his authorized political committees with respect to any election for Federal office"); 76 Fed. Reg. 8368, 8370 (Feb. 14, 2011) (increasing statutory contribution limit to $2500 to account for inflation), but argue that § 441c's blanket ban on contributions by federal contractors goes too far. As Wagner I explained, a ban on political contributions satisfies the First Amendment only if it is "closely drawn to match a sufficiently important interest." 854 F. Supp. 2d at 88 (quoting FEC v. Beaumont, 539 U.S. 146, 162 (2003)); see also McConnell v. FEC, 540 U.S. 93, 231-32 (2003) (applying Beaumont standard to ban on contributions by children under 18), overruled in part on

other grounds by <u>Citizens United v. FEC</u>, 130 S. Ct. 876 (2010).  Before surveying Plaintiffs'

catalog of objections to how <u>Wagner I</u> applied that standard, the Court clarifies the restrictions

imposed by § 441c and lays out the Government's interests at play here.

1.   <em>Restrictions in § 441c and the Government's Interests</em>

Sorting through Plaintiffs' challenges to § 441c requires understanding what, exactly,

§ 441c restricts and how each restriction purportedly advances the Government's interests.

Section 441c(a) prohibits federal contractors from making any contribution "to any political

party, committee, or candidate for public office or to any person for any political purpose or

use."  A central restriction is thus the prohibition on contributions to candidates for political

office.  Directly related to that bar on candidate contributions are the prohibitions on contributing

to political parties and to committees related to the candidate – prohibitions that prevent

contributors from dodging the ban on candidate contributions by giving to groups that could

coordinate with the candidate.

The Government offers two interests to justify § 441c.  First, <u>Civil Service Commission</u>

<u>v. National Ass'n of Letter Carriers, AFL-CIO</u>, 413 U.S. 548 (1973), recognized the

Government's interest in ensuring that federal employment does "not depend on political

performance," that employees "enforce the law and execute the programs of the Government

without bias or favoritism for or against any political party or group or the members thereof,"

and that employees are "free from pressure and from express or tacit invitation to vote in a

certain way or perform political chores in order to curry favor with their superiors rather than to

act out their own beliefs."  <u>Id.</u> at 564-66.  Asserting that this interest applies with equal force to

federal contractors, the Government argues that § 441c's ban furthers its interest in protecting

contractors against coercion.  Plaintiffs raise various objections to this first interest and its fit

6

with § 441c.  The Court need not resolve those objections, however, if the other interest asserted

by the Government – the interest <u>Wagner I</u> relied on – sustains the statute.

That interest is avoiding *quid pro quo* corruption or the appearance thereof, which is a

"sufficiently important interest."  <u>See</u> <u>Buckley v. Valeo</u>, 424 U.S. 1, 25-26 (1976).  Plaintiffs

themselves admit as much.  <u>See</u> Pls. Mot. at 7.  The Supreme Court has recognized that limits on

contributions to both candidates and groups that coordinate with candidates can further the

anticorruption interest.  Direct contributions to candidates can "secure a political *quid pro quo*

from current and potential office holders," which "undermine[s]" the "integrity of our system of

representative democracy."  <u>Buckley</u>, 424 U.S. at 26-27.  "Of almost equal concern," moreover,

candidate contributions can raise "the appearance of corruption," which Congress "could

legitimately conclude" will erode "confidence in the system of representative Government . . . to

a disastrous extent."  <u>Id.</u> at 27 (citation omitted).

Contributions to groups allowed to coordinate with the candidate, furthermore, can

circumvent limits on direct candidate contributions.  From the candidate's point of view, money

that can be spent in coordination is almost as good as money in his kitty – and thus justifies the

same corruption fears.  <u>See FEC v. Colo. Repub. Fed. Campaign Comm.</u>, 533 U.S. 431, 464

(2001) ("There is no significant functional difference between a party's coordinated expenditure

and a direct party contribution to the candidate, and there is good reason to expect that a party's

right of unlimited coordinated spending would attract increased contributions to parties to

finance exactly that kind of spending.  Coordinated expenditures of money donated to a party are

tailor-made to undermine contribution limits.") (footnote omitted).  Using that anticircumvention

rationale, the Supreme Court has upheld many restrictions on coordinated funds.  In <u>McConnell</u>,

the Court approved of limits on contributions to political parties.  <u>See</u> 540 U.S. at 144-45

("contributions to a federal candidate's party in aid of that candidate's campaign threaten to create – no less than would a direct contribution to the candidate – a sense of obligation"); see also Buckley, 424 U.S. at 38; RNC v. FEC, 698 F. Supp. 2d 150 (D.D.C.), aff'd, 130 S. Ct. 3544 (2010) (mem.). In Colorado Republican Federal Campaign Committee, the Court held that Congress could constitutionally count coordinated expenditures by political parties as contributions to the candidate, subject to the normal limitations on contributions. See 533 U.S. 431. Twenty years earlier, the Court in California Medical Ass'n v. FEC, 453 U.S. 182 (1981), allowed Congress to limit contributions to political committees that were permitted to contribute to candidates.

Section 441c also bans another set of contributions not yet mentioned: contributions to "any political . . . committee" and to "any person for any political purpose or use." Those statutory categories presumably include contributions to groups making only "independent expenditures" – that is, expenditures that are "not made in concert or cooperation with or at the request or suggestion of [a] candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents." 2 U.S.C. § 431(17). Outside of the FEC's regulatory web, groups that make only independent expenditures are known as "Super PACs." The *en banc* D.C. Circuit recently struck down a cap on contributions to Super PACs because, after Citizens United, "the government has no anti-corruption interest in limiting contributions to an independent expenditure group." SpeechNow.org v. FEC, 599 F.3d 686, 695 (D.C. Cir. 2010) (*en banc*). SpeechNow creates substantial doubt about the constitutionality of any limits on Super PAC contributions – including § 441c's ban on contributions by federal contractors. Plaintiffs, however, stated at the hearing that they do not directly challenge the ban on contributing to Super PACs, and in fact, they admitted there that they may not have standing to

do so.  The Court, therefore, will leave this question as it need not venture where the parties themselves choose not to go.

The key question that remains, then, is whether the complete ban on contributions by federal contractors imposed by § 441c is "closely drawn" to the Government's anticorruption interest.

### 2.  *Plaintiffs' Objections*

Plaintiffs' Motion focuses on supposed defects in Wagner I – namely, the lack of evidence that contractor contributions create a justifiable worry of corruption, the poor fit between those corruption worries and an outright ban on contributions, and a few miscellaneous objections.  The Court considers each issue in order.

### a.  Evidence

While Plaintiffs agree that "it is possible that a Member of Congress, the President, or a political appointee might attempt to influence the award of a federal contract," they say the Government needs to prove that the risk of such improper influence is more than theoretical.  Pls. Mot. at 7 (emphasis in original).  The Supreme Court has said that the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."  Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 391 (2000).

Congress has banned political contributions by federal contractors since 1940, the laws emerging after scandals involving those contractors.  See Wagner I, 854 F. Supp. 2d at 89.  Most discussed was the "Democratic campaign-book racket."  84 Cong. Rec. 9599 (1939) (statement of Rep. Taylor).  In that scheme, agents of the Democratic Party apparently met with New Deal contractors throughout the country.  See id.  After a contractor was "adroitly reminded of the

business he had received from the Government and the prospect of future favors was dangled before him," the agent would ask the contractor to "buy" worthless political books at bloated prices.  Id.  In other words, the controlling Democratic Party made the continuation of government contracts hinge on political contributions – *quid pro quo* corruption.  One point of the scheme calls for special emphasis here: although the number of books that a contractor was expected to buy varied with the size of his contract, even a small contractor was compelled to buy a few books if he wanted to keep receiving government contracts.  See id.

We are now, of course, generations past the scandals that inspired the ban.  The Supreme Court has noted the "difficulty of mustering evidence to support long-enforced statutes" because "there is no recent experience" of life without the restriction.  Colo. Repub. Fed. Campaign Comm., 533 U.S. at 457.  But while the Federal Government has had no recent experience with legal contributions by its contractors, states have.  And their experiences substantiate the corruption worries that attend contributions by government contractors.

Indeed, state campaign financing brims with corrupt contractor-candidate relationships.  In Connecticut, for example, former Governor John Rowland pled guilty to accepting "gifts and services from state contractors, including vacations, flights on a private jet, and renovations to his lake cottage," in exchange for steering further state contracts to the contractors.  Green Party of Conn. v. Garfield, 616 F.3d 213, 219 (2d Cir. 2010).  New York City experienced "actual pay-to-play scandals in the 1980s."  Ognibene v. Parkes, 671 F.3d 174, 181 (2d Cir. 2011).  In Illinois, Governor Rod Blagojevich reportedly designated a "$25,000 club" for donors giving $25,000, and three-quarters of those donors "got something – from lucrative state contracts to coveted state board appointments to favorable policy and regulatory actions."  Jeffrey Meitrodt *et al.*, The Governor's $25,000 Club, CHI. TRIB., Apr. 27, 2008, at 1.

Even when no scandal erupts, some state contractors report feeling that their contracts hinge on continuing campaign contributions – perhaps with good reason.  See, e.g., James Drew & Mike Wilkinson, Fund Managers Ratcheted Up Political Giving, TOLEDO BLADE, Apr. 19, 2005, http://www.toledoblade.com/frontpage/2005/04/19/Fund-managers-ratcheted-up-political-giving.html ("[M]ore than half of the firms chosen by the Bureau of Workers' Compensation to invest $500 million in a new emerging managers fund, contributed to the Republican party and statewide candidates . . . .  Only six of the 67 firms that didn't get the state's business had principals or employees contribute to Ohio politicians or state political parties . . . ."); Mike Wilkinson, Wayne Co. Vendors Give Big to Ficano, DETROIT NEWS, June 4, 2012, at A1 ("'You wonder what in the heck would happen if I didn't give,' said Jack Doheny, whose Jack Doheny Supplies sells sewer cleaning equipment to the county.  He and another employee have given $5,900 to Ficano's political action committee and campaign since 2008.").

Those state experiences, moreover, address only the risk of actual corruption.  That political contributions by government contractors could appear corrupt intuitively follows from the reality.  The Fourth Circuit's recent justification for upholding a ban on contributions by lobbyists applies equally to contributions by contractors:  A contractor's role is legitimate and important, "but by its very nature, it is prone to corruption and therefore especially susceptible to public suspicion of corruption.  Any payment made by" a contractor "to a public official, whether a campaign contribution or simply a gift, calls into question the propriety of the relationship."  Preston v. Leake, 660 F.3d 726, 737 (4th Cir. 2011) (emphasis in original).

Congress need not roll back its longstanding ban and wait for a scandal to arise in order to provide evidence that § 441c prevents corruption:  "There is no reason to require the legislature to experience the very problem it fears before taking appropriate prophylactic

measures. Appellants essentially propose giving every corruptor at least one chance to corrupt

before anything can be done, but this dog is not entitled to a bite." <u>Ognibene</u>, 671 F.3d at 188

(citations omitted).  The Democratic campaign-book racket and recent state scandals involving

state contractors, therefore, provide sufficient evidence that a ban on political contributions by

federal contractors is closely drawn to the Government's interest in preventing actual and

apparent *quid pro quo* corruption.

b.   Over- and Underinclusion

Next, Plaintiffs complain that § 441c's ban does not fit the Government's anticorruption

interest: the ban covers contributions by federal contractors that are <u>not</u> likely to corrupt, while it

excludes similar contributions by others that <u>are</u> likely to corrupt.  Neither argument is

convincing.

Plaintiffs begin by arguing that § 441c covers contracts that present no risk of corruption.

For example, they say that some agencies have internal procedures to prevent corruption and that

no one who understands the contracting process at these agencies could think that contributions

by contractors could sway an agency's choice.  The Supreme Court, however, has given

Congress the flexibility to attack corruption from multiple flanks.  <u>See</u> <u>Buckley</u>, 424 U.S. at 27-

28 ("Appellants contend that the contribution limitations must be invalidated because bribery

laws and narrowly drawn disclosure requirements constitute a less restrictive means of dealing

with proven and suspected *quid pro quo* arrangements.  But laws making criminal the giving and

taking of bribes deal with only the most blatant and specific attempts of those with money to

influence governmental action.  And while disclosure requirements serve the many salutary

purposes discussed elsewhere in this opinion, Congress was surely entitled to conclude that

disclosure was only a partial measure, and that contribution ceilings were a necessary legislative

12

concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed.") (footnote and internal quotation marks omitted).  Even if an agency's fortifications against corruption seem adequate to someone with perfect information, moreover, the Government worries about what appears corrupt to the actual voting populous: "Democracy works only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption."  Shrink Mo. Gov't PAC, 528 U.S. at 390 (internal quotation marks omitted).

On a similar note, Plaintiffs say that "federal contracts are negotiated, approved and implemented at the agency level, with no role for the President or any Member of Congress." Pls. Mot. at 8.  While agencies certainly play a prominent role in our Government, elected officials still hold sway over the Government they run.  The Court will not declare that the People's elected representatives are impotent in the contracting process.

Plaintiffs also question the restrictions on contributions to political parties.  As the Democratic campaign-book racket shows, however, parties are not immune from corruption; indeed, political parties are often the perfect organizers for large pay-to-play schemes.

Plaintiffs next conjure up hypothetical scenarios involving contributions that are unlikely to lead to corruption, like contributions to minor political parties or to candidates who have already lost the election.  Section 441c need not be a perfect fit, however, or even narrowly tailored.  Even if all of Plaintiffs' hypotheticals hold, § 441c is still "closely drawn" to the anticorruption interests it furthers.

Plaintiffs close their overinclusion argument by presenting a menu of ways to narrow § 441c's ban while continuing to cover the most parlous contributions.  All of the exceptions Plaintiffs seek, however, still present the danger of corruption.  First, Plaintiffs suggest excluding personal-service contractors who are the functional equivalents of federal employees.  If a contractor fills the same role as a federal employee, however, her contract will almost invariably provide her livelihood.  Not only are these contracts sizeable, therefore, but they are also probably vital to the contractor.  There is no reason to think the Government's anticorruption interest substantially diminishes with such contractors.

Second, Plaintiffs suggest excluding contracts won through competitive bidding.  But while competitive bidding offers some protection against corruption, officials can still rig the bidding or favor a contractor in renegotiations.  See, e.g., Colleen Heild, NMDOT Documents Leaked to Bidder, ALBUQUERQUE J., July 10, 2011, at A1 (reporting that former New Mexico Transportation Commission Chairman gave confidential documents to favored contractor before bidding).  Third, and directly contrary to their second suggestion, Plaintiffs propose excluding sole-source contracts – that is, no-bid contracts in which the Government approaches the contractor directly.  The risk of corruption or apparent corruption in such contracts is obvious.  That Plaintiffs could simultaneously suggest excluding competitive-bid and no-bid contracts implies that neither bidding structure foils legitimate corruption worries.

Fourth, Plaintiffs recommend excluding small contracts or permitting contractors to make modest contributions.  As the Democratic campaign-book racket illustrates, however, corruption can emerge even when relatively small amounts of money are in play.  A contractor probably will not trade a suitcase overflowing with cash for a small contract.  But systematic corruption can ensnare contracts of all sizes.  And because 500 contributions of $2000 are just as good as a

single contribution of $1,000,000, a candidate or a political party could spawn a lucrative scheme (again, as in the Democratic campaign-book racket) by blacklisting contractors who refuse to make modest contributions.

Fifth and finally, Plaintiffs suggest that, instead of banning contributions by current contractors, Congress could ban contracts for recent contributors. As those options are nearly identical, the closely drawn standard leaves Congress enough flexibility to choose either course. Section 441c, moreover, kicks in from the "commencement of negotiations for" the contract, 2 U.S.C. § 441c(a)(1), so Congress has already partially adopted Plaintiffs' suggestion.

Switching gears, Plaintiffs complain that others in similar situations can still contribute, including people who receive federal grants, loans, or guarantees; people who want admission to the tuition-free military academies; and people who seek coveted government-appointed positions like ambassadorships. Plaintiffs believe that permitting contributions by these other people means that § 441c is not closely drawn to the Government's interest. But as the Court explained in Wagner I, the First Amendment favors speech – not regulation – and a decision to stop regulation short of the Constitution's outer bounds should be encouraged. See 854 F. Supp. 2d at 94. Congress need not solve every problem at once. Contractors are at least as likely to attract corruption as these other people, so § 441c is not "seriously underinclusive." Cf. Brown v. Entm't Merchs. Ass'n, 131 S. Ct. 2729, 2740-42 (2011).

c.  Other Objections

Plaintiffs throw out a couple more First Amendment objections to see what sticks. Nothing does.

First, Plaintiffs complain that Congress relied on a discredited legal theory in enacting the ban on contributions by federal contractors. Justice Holmes said that governments could restrict

15

their employees' speech without raising constitutional concerns: a policeman "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." McAuliffe v. Mayor of New Bedford, 29 N.E. 517, 517 (Mass. 1892). While that view held sway for a time – including when Congress first banned contributions by contractors in 1940 (although not when it reenacted the ban in the 1970s) – the Supreme Court has "long since rejected Justice Holmes' famous dictum." Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 674 (1996).

While legislative motives sometimes matter – for example, if legislators pass a law with the purpose of discriminating – this is not one of those times. Congress need not understand the constitutional theory that sustains its legislation. See NFIB v. Sebelius, 132 S. Ct. 2566, 2598 (2012) ("The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.") (internal quotation marks omitted). Indeed, the Supreme Court has upheld related provisions of the Hatch Act that restrict federal employees' First Amendment rights, despite the fact that those provisions would have (according to Plaintiffs) relied on the same misunderstanding of constitutional law. See Nat'l Ass'n of Letter Carriers, 413 U.S. 548.

Second, Plaintiffs complain that Wagner I ignored the section of McConnell that invalidated a ban on political contributions by those under 18. See 540 U.S. at 231-32. That section of McConnell is a standard application of Beaumont with no particular relevance here, explaining why Wagner I did not cite it. In McConnell, the Government asserted an anticircumvention interest – preventing parents from evading contribution limits by contributing in the names of their minor children. See id. at 232. The Court thought such circumvention unlikely. See id. In any event, the Court concluded, banning minors from contributing in order

16

to prevent parents from circumventing the contribution ceiling was a long way from close tailoring: Congress instead could have made a contribution ceiling that applied to the entire family unit, imposed a lower ceiling for minors, or limited the ban to young children.  See id.

The ban on contributions by contractors at issue here suffers from none of the flaws of the ban on contributions by minors.  Contractor contributions pose a clear risk of actual and apparent corruption.  An outright ban is necessary for contractors, moreover, because – as the evidence shows – even small contributions can corrupt the process.  Section 441c thus passes Beaumont scrutiny.

B.  Equal Protection

The Fourteenth Amendment's Equal Protection Clause requires that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  That equal-protection guarantee applies to the Federal Government through the Fifth Amendment Due Process Clause.  See Wagner I, 854 F. Supp. 2d at 94.  Applying the Beaumont standard, in Wagner I the Court upheld Congress's differential treatment of individual federal contractors vis-à-vis corporate federal contractors and federal employees.  See id. at 97-99.

Both the FEC and Plaintiffs believe that the Court applied the wrong level of scrutiny; Plaintiffs seek strict scrutiny, while the FEC desires rational basis.  Neither party, however, advances new arguments for their standard, and Plaintiffs conceded at the hearing that their concern is with the application of the standard rather than the standard itself.  The Court therefore sticks with the Beaumont standard of scrutiny and considers the objections Plaintiffs raise to its application.  In doing so, the Court bears in mind that Plaintiffs at the hearing conceded they knew of no case in which an equal-protection challenge to contribution limits succeeded where a First Amendment one did not.  See Ill. Liberty PAC v. Madigan, No. 12-C-

17

5811, 2012 WL 4764152, at *12 (N.D. Ill. Oct. 5, 2012) ("Plaintiffs have not cited any case

where a litigant who lost a First Amendment challenge to contribution limits proceeded to

prevail by re-framing the challenge under the Equal Protection Clause.").

Plaintiffs claim that as individual contractors, they are treated worse than corporate

contractors.  They point out that corporate contractors may form PACs that make direct political

contributions.  See 2 U.S.C. § 441c(b).  And they note that corporate officers, shareholders, and

employees may make contributions.  As the Court explained in Wagner I, however, PACs and

people that run corporations have legal identities distinct from those of the corporate contractor.

See 854 F. Supp. 2d at 98-99.  Plaintiffs respond that no observer would see such corporate

PACs and individuals as distinct.  The Supreme Court, however, disagrees.  See Citizens United,

130 S. Ct. at 897 ("A PAC is a separate association from the corporation.  So the PAC exemption

from § 441b's expenditure ban, § 441b(b)(2), does not allow corporations to speak.").  As the

Court previously held, therefore, individual contractors are not similarly situated under the law to

corporate contractors' PACs or their officials.  See Wagner I, 854 F. Supp. 2d at 98-99.

Moreover, even if they were, § 441c allows contributions from people (literally) related to

individual contractors.  If the public believes that a contribution from a contractor's CEO

corrupts just as much as a contribution from the contractor, the same has to be true for a

contribution from an individual contractor's spouse.  There is thus no significant difference in

treatment.

Plaintiffs also complain that they are treated worse than federal employees.  This

comparison is mushier.  To begin, federal employees may not contribute to their employer or

employing authority.  See 18 U.S.C. § 603(a).  And not all federal employees may make political

contributions.  See, e.g., 5 C.F.R. § 734.413(a) ("An employee of the Federal Election

Commission may not request or receive from, or give to, an employee, a Member of Congress, or an officer of a uniformed service a political contribution."). Even when federal employees may contribute, they labor under other restrictions unknown to contractors. Unlike federal contractors, for example, federal employees generally cannot solicit contributions. See 5 C.F.R. § 734.303(a). As the Court said in Wagner I, "The restrictions on federal contractors' freedoms of expression and association are different from those on federal employees, but not necessarily more severe." 854 F. Supp. 2d at 98. These differences are not surprising. The Government regulates political activity by federal contractors primarily to prevent corruption; the Government regulates political activity by federal employees for a wide array of reasons, including ensuring that employees appear neutral and preventing employees from feeling coerced. See Nat'l Ass'n of Letter Carriers, 413 U.S. at 564-67. It is not clear that contractors are more restricted than employees. See Cal. Med. Ass'n, 453 U.S. at 200 ("Appellants' claim of unfair treatment [under the equal-protection component of the Fifth Amendment] ignores the plain fact that the statute as a whole imposes far fewer restrictions on individuals and unincorporated associations than it does on corporations and unions.") (emphasis in original). The dissimilar roles of contractors and employees, moreover, justify the distinct regulatory schemes that the Government has fashioned. No equal-protection violation lies here either.

## IV.   Conclusion

For the aforementioned reasons, the Court will deny Plaintiffs' Motion for Summary Judgment and grant the FEC's Motion for Summary Judgment. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  November 2, 2012